FILED IN
COURT OF CRIMINAL APPEALS

August 4, 2015

ABEL ACOSTA, CLERK

AP-77,029
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/3/2015 3:12:21 PM
Accepted 8/3/2015 3:19:51 PM
ABEL ACOSTA
CLERK

NO. AP-77,029

IN THE

COURT OF CRIMINAL APPEALS

AT AUSTIN, TEXAS

JAMES HARRIS JR.,
Appellant

Vs.

THE STATE OF TEXAS,

Appellee

ON APPEAL IN CAUSE NO. 67063

149TH JUDICIAL DISTRICT COURT, BRAZORIA COUNTY, TEXAS

HONORABLE W. EDWIN DENMAN, JUDGE PRESIDING

**BRIEF FOR THE STATE**

JERI YENNE
CRIMINAL DISTRICT ATTORNEY
BRAZORIA COUNTY, TEXAS

DAVID BOSSERMAN
Assistant Criminal District Attorney
111 E. Locust, Suite 408A
Angleton, Texas 77515
(979) 864-1230
(979) 864-1525 (Fax)
Bar Card No. 02679520
davidb@brazoria-county.com

ATTORNEYS FOR APPELLEE
DATE: AUGUST 3, 2015

Oral Argument is Waived

NO. AP-77,029

IN THE

| 149TH JUDICIAL DISTRICT COURT | § | COURT OF CRIMINAL |
| OF | § | APPEALS AT |
| BRAZORIA COUNTY, TEXAS | § | AUSTIN, TEXAS |

JAMES HARRIS JR.,

Appellant

Vs.

THE STATE OF TEXAS,

Appellee

═══════════════════════════════════════════════════════

**BRIEF FOR THE APPELLEE**

═══════════════════════════════════════════════════════

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

The State of Texas, the prosecuting authority in Cause No. 67063 in the 149th Judicial District Court of Brazoria County, Texas, respectfully submits this brief in reply to the brief of Defendant-Appellant, JAMES HARRIS JR., and would respectfully show the Court the following:

# SUBJECT INDEX

PARTIES TO THE CASE.................................................................. vii

LIST OF AUTHORITIES................................................................ ix

STATEMENT OF THE CASE............................................................ 1

STATEMENT OF FACTS.................................................................. 1

    *State's Evidence* ............................................................ 2

    *Defense Evidence*........................................................... 16

SUMMARY OF ARGUMENT................................................................ 26

    *First Point of Error*........................................................ 26

    *Second Point of Error*...................................................... 27

    *Third Point of Error*....................................................... 28

    *Fourth Point of Error*...................................................... 29

    *Fifth Point of Error*........................................................ 30

    *Sixth Point of Error*....................................................... 32

    *Seventh Point of Error*..................................................... 33

    *Eighth Point of Error*...................................................... 34

    *Ninth Point of Error*....................................................... 35

    *Tenth Point of Error*....................................................... 35

STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR......... 37

DISCUSSION.................................................................................... 37

*Relevant Facts*...................................................................... 37

*Analysis*............................................................................... 41

*Harm*.................................................................................. 44

STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR...... 49

DISCUSSION............................................................................ 49

    *Relevant Facts*...................................................................... 49

    *Analysis*............................................................................... 50

    *Harm*.................................................................................. 52

STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR...... 57

DISCUSSION............................................................................ 57

    *Relevant Facts*...................................................................... 57

    Standard of Review................................................................. 60

    *Analysis*............................................................................... 62

STATE'S REPLY TO APPELLANT'S FOURTH POINT OF ERROR.. 65

DISCUSSION............................................................................ 65

    *Relevant Facts*...................................................................... 65

    *Standard of Review*................................................................ 69

    *Analysis*............................................................................... 69

STATE'S REPLY TO APELLANT'S FIFTH POINT OF ERROR......... 72

DISCUSSION............................................................................ 72

*Standard of Review*..................................................................... 72

*Analysis*..................................................................................... 73

Confession Bias............................................................... 73

Death Penalty Bias........................................................... 76

Mitigation Bias................................................................ 78

STATE'S REPLY TO APPELLANT'S SIXTH POINT OF ERROR......... 82

DISCUSSION.......................................................................... 82

*Standard of Review*..................................................................... 85

*Analysis*..................................................................................... 85

STATE'S REPLY TO APPELLANT'S SEVENTH POINT OF ERROR 87

DISCUSSION.......................................................................... 87

*Standard of Review*..................................................................... 87

*Analysis*..................................................................................... 88

*Juror Martinez*........................................................................... 89

STATE'S REPLY TO APPELLANT'S EIGHTH POINT OF ERROR...... 93

DISCUSSION.......................................................................... 93

*Relevant Facts*........................................................................... 93

*Repetition*.................................................................................. 95

*Commitment Question*............................................................... 96

*Harm*........................................................................................ 97

STATE'S REPLY TO APPELLANT'S NINTH POINT OF ERROR..... 100

DISCUSSION...................................................................... 100

    *Analysis*...................................................................... 100

    *Harm*...................................................................... 102

STATE'S REPLY TO APPELLANT'S TENTH POINT OF ERROR....... 105

DISCUSSION...................................................................... 105

    *Analysis*...................................................................... 105

    *Harm*...................................................................... 107

CONCLUSION...................................................................... 108

CERTIFICATE OF COMPLIANCE............................................ 109

CERTIFICATE OF SERVICE.................................................. 109

## PARTIES TO THE CASE

**APPELLANT:**          **JAMES HARRIS JR.**

### *Attorneys for Appellant at Trial:*
        *Name:*
**Thomas J. "Jay" Wooten**
SBOT NO. 21993500
**Mary Conn**
SBOT NO. 04668050
**Kerri Mallon**
SBOT NO. 24049165
        *Address:*
Regional Public Defender's Office for Capital Cases
P.O. Box 2097
Lubbock, Texas 79408
Phone: 806-775-5650

### *Attorney for Appellant on Appeal:*
        *Name:*
**Jimmy Phillips, Jr.**
SBOT NO.  15953000
        *Address:*
P.O. Drawer 29
Angleton, Texas 77516-0029
jimmy@jpjlaw.com

**APPELLEE:**            **THE STATE OF TEXAS**

### *Attorney for the State at Trial:*
        *Name:*
**Jeri Yenne**
SBOT NO. 04240950
**Mary Ann Aldous**
SBOT NO. 24000987
        *Address:*
Brazoria County Criminal District Attorney's Office
Brazoria County Courthouse
111 E. Locust, Suite 408A

Angleton, Texas  77515
(979) 864-1230
(979) 864-1525 (Fax)

***Attorney for the State on Appeal:***
 *Name:*
**David Bosserman**
SBOT NO. 02679520
 *Address:*
Brazoria County Criminal District Attorney's Office
Brazoria County Courthouse
111 E. Locust, Suite 408A
Angleton, Texas  77515
(979) 864-1230
(979) 864-1525 (Fax)
davidb@brazoria-county.com

# LIST OF AUTHORITIES

**Cases**

***Adams v. State***, 577 S.W.2d 717 (Tex. Crim. App. 1979)*, reversed on other grounds*, 100 S.Ct. 2521(1980) ...........................................................................106

***Alvarado v. State***, 912 S.W.2d 199 (Tex. Crim. App. 1995) ...................................88

***Anderson v. State***, 717 S.W.2d 622 (Tex. Crim. App. 1986) ...................................47

***Baggett v. State***, 367 S.W.3d 525 (Tex. App. – Texarkana, *pet. ref'd*) .................55

***Baker v. State***, 87 Tex. Crim. 305, 221 S.W.607 (Tex. Crim. App. 1920)...........106

***Barajas v. State,*** 93 S.W.3d 36 (Tex. Crim. App. 2002) ............................... 96, 101

***Barney v. State***, 698 S.W.2d 114 (Tex. Crim. App. 1985) .....................................75

***Bess v. State***, No. AP-76377, 2013 WL 827479 (Tex. Crim. App. Mar. 6, 2013), *cert. denied,* 134 S. Ct. 899 (2014) ........................... 64, 70, 80, 86

***Boyd v. State***, 811 S.W.2d 105 (Tex. Crim. App. 1991), *cert. denied,* 112 S.Ct. 448 (1991).................................................................. 96, 102

***Brooks v. State***, 323 S.W.3d 893 (Tex. Crim. App. 2010)....................................42

***Brown v. State***, 122 S.W.3d 794 (Tex. Crim. App. 2003), *cert. denied*, 124 S.Ct. 1678 (2004) ............................................................... 52, 55

***Cantu v. State,*** 939 S.W.2d 627 (Tex. Crim. App. 1996), *cert. denied*, 118 S.Ct. 557 (1997)..........................................................................43

***Cordova v. State***, 733 S.W.2d 175 (Tex. Crim. App. 1987) *cert. denied*, 108 S.Ct. 2915 (1988) ............................................................... 70, 76

***Cortez v. State***, 683 S.W.2d 419 (Tex. Crim. App. 1984)....................................106

***Davis v. State***, 313 S.W.3d 317 (Tex. Crim. App. 2010), *cert. denied*, 132 S.Ct. 122 (2011)...................................................................97

*Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010) *cert. denied*,
132 S.Ct. 128 (2011)...................................................................... 61, 63, 70

*Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014) .................... 97, 102, 107

*Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) ... 60, 62, 69, 70, 71, 72, 74, 78, 80, 81, 85

*Gonzales v. State*, 353 S.W.3d 826 (Tex. Crim. App. 2011) .................................61

*Guerra v. State*, 771 S.W.2d 453 (Tex. Crim. App. 1988), *cert. denied*,
109 S.Ct. 3260 (1989) ...............................................................................95

*Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998), *cert. denied*,
120 S.Ct. 444 (1999)........................................................ 62, 71, 74, 81, 86

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) ..........................................45

*Lopez v. State*, 990 S.W.2d 770 (Tex. App. - Austin 1999, *no pet*.)........................44

*Matamoros v. State*, 901 S.W.2d 470 (Tex. Crim. App. 1995) ...............................44

*Mauldin v. State*, 14-08-00419-CR, 2010 WL 1486959 (Tex. App – Houston
[14th] April 15, 2010, *no pet*.)(not designated for publication)...........................43

*McCarter v. State*, 837 S.W.2d 117 (Tex. Crim. App. 1992) .................................95

*McCoy v. State*, 713 S.W.2d 940 (Tex. Crim. App. 1986), *cert. denied*,
107 S.Ct. 1590 (1987) ................................................................................76

*McCray v. State*, A14-89-00271-CR, 1991 WL 235281(Tex. App. –
Houston [14th Dist.] Nov. 14, 1991, *pet. ref'd*)(not designated for publication)..96

*McManus v. State*, 591 S.W.2d 505 (Tex. Crim. App. 1979), *overruled
on other grounds*, 744 S.W.2d 112 (Tex. Crim. App. 1988) ..............................95

*Mooney v. State,* 817 S.W.2d 693 (Tex. Crim. App. 1991)....................................87

*Mooney v. State*, 888 S.W.2d 182 (Tex. App. – Houston [1st Dist.]1994, *no pet*.).42

*Morin v. State*, 682 S.W.2d 265 (Tex. Crim. App. 1983)......................................50

*Penry v. State*, 903 S.W.2d 715 (Tex. Crim. App. 1995), *cert. denied*, 116 S.Ct. 480 (1995)..................................................................................107

*Petriciolet v. State*, 442 S.W.3d 643 (Tex. App. – Houston [1st Dist.] 2014, *pet. ref'd*.) ........................................................................ 45, 47

*Phillips v. State*, 701 S.W.2d 875 (Tex. Crim. App. 1985), *overruled on other grounds*, 757 S.W.2d 744 (1988) ..........................................76

*Rachal v. State*, 917 S.W.2d 799 (Tex. Crim. App. 1996), *cert. denied*, 117 S.Ct. 614 (1996)...........................................62, 71, 74, 81,  86

*Reeves v. State,* 420 S.W.3d 812 (Tex. Crim. App. 2013) .....................................53

*Remsburg v. State*, 219 S.W.3d 541 (Tex. App. - Texarkana 2007, *pet. ref'd*)......52

*Rhoades v. State*, 934 S.W.2d 113 (Tex. Crim. App. 1996) .................................105

*Ross v. State*, 133 S.W.3d 618 (Tex. Crim. App. 2004)...........................................55

*Sanchez v. State,* 165 S.W.3d 707 (Tex. Crim. App. 2005)...................................101

*Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003), *cert. denied*, 124 S.Ct. 511 (2003).....................................................................................102

*Smiley v. State*, 129 S.W.3d 690 (Tex. App. – Houston [1st Dist.] 2004, *no pet.*)107

*Smith v. State*, 703 S.W.2d 641 (Tex. Crim. App. 1985), *overruled on other grounds*, 424 S.W.3d 535 (2014) ....................................................................102

*Sparks v. State*, 943 S.W.2d 513 (Tex. App. – Fort Worth 1997, *pet. ref'd*) .........42

*Standefer v. State,* 59 S.W.3d 177 (Tex. Crim. App. 2001) .................................101

*State v. Smith*, 335 S.W.3d 706 (Tex. App. – Houston [14th Dist.] 2011, *pet. ref'd*) ..............................................................................................42

*Thomas v. State*, 701 S.W.2d  653 (Tex. Crim. App. 1985)...................................87

*Vela v. State*, 209 S.W.3d 128 (Tex. Crim. App. 2006)...........................................42

*Vuong v. State*, 830 S.W.2d 929 (Tex. Crim. App. 1992), *cert. denied*, 113 S.Ct. 595 (1992)..................................................................................................44

*Walters v. State*, 247 S.W.3d 204 (Tex. Crim. App. 2007).....................................44

*White v. State*, 779 S.W.2d 809 (Tex. Crim. App. 1989), *cert. denied*, 110 S.Ct. 2575 (1990), .................................................................................75

## Codes

**Tex. Crim. Proc. Code Ann. art. 46B.003(a) (Vernon 2006)**..............................54

**Tex. Code Crim. Proc. Ann. at. 26.13 (Vernon Supp. 2014)**...........................50

**Tex. Code Crim. Proc. 36.14 (Vernon 2007)**...................................................44, 51

**Tex. Code Crim. Proc. 38.04 (Vernon 2007)**.........................................................42

**Tex. Code Crim. Proc. 38.05 (Vernon 1997)**.........................................................44

**Tex. Penal Code Ann. § 8.01 (Vernon 2011)**.........................................................54

**Tex. Health & Safety Code Ann. § 571.003(14) (Vernon 2010)**........................54

## Rules

**Tex. R. App. Proc. 44.2(b) (Vernon 2003)**.....................................44, 97, 102, 107

## Secondary Materials

**8 Tex. Prac. Criminal Forms and Trial Manuel §99.11 (11th ed.),** *McCormick, Blackwell, & Blackwell*...............................................................52

## STATEMENT OF THE CASE

The Appellant was indicted in a three paragraph indictment for the Capital Murder of Alton Wilcox by stabbing him in the course of a robbery/burglary of a habitation (CR 1 at 8). To this charge he plead guilty, but had the jury assess punishment (CR 4 at 186, 187)(RR 57 at 37). Having heard the evidence presented by the parties on punishment, the jury found the Appellant to be a future danger under special issue one, and found insufficient mitigating circumstances to warrant a sentence of life without parole. The Appellant was sentenced to death (CR 4 at 186, 187). The Appellant filed a motion for new trial (CR 4 at 189-191) and an amended motion for new trial (CR 4 at 199-202), which were denied by operation of law.

## STATEMENT OF FACTS

The Appellant plead guilty to the capital murder of Alton Wilcox. He knocked on the door of Darla and Alton Wilcox, an elderly couple, and when Darla answered the door, he pushed his way in. She attempted to push him out and he began stabbing her. He then demanded money and continued stabbing her when she did not comply immediately. Her husband, who was injured and using a walker, came to her aid in response to her cries. The Appellant stabbed him multiple times, ultimately causing his death. Darla came to her husband's aid, to keep the Appellant from stabbing her husband. The Appellant resumed stabbing

1

her again and continued to demand money. She gave him what money they had and he escaped by stealing their car. After hearing punishment evidence, the jury sentenced him to death.

### *State's Evidence*

Angleton Police Officers answered a dispatch of a possible stabbing at 808 North Tinsley in Angleton on January 14, 2012 at about 1:00 pm (RR 58 at 10-12, 14). Inside, police found an elderly man and woman on the floor in the kitchen in a pool of blood (RR 58 at 16). The female was still on the phone with dispatch (RR 58 at 18, 19). The female was identified as Darla Wilcox and the male as Alton Wilcox (RR 58 at 18). Both victims were severely stabbed and tied up with white rope (RR 58 at 24)(RR 58 at 59, 60). If they did not get to help soon, they would die (RR 58 at 24). Mr. Wilcox wanted officers to focus on helping his wife (RR 58 at 24, 25). There appeared to have been a struggle in the hallway and kitchen (RR 58 at 26, 31). A walker was found in the hallway (RR 58 at 29, 30). A phone was on the floor with blood stains on it (RR 58 at 28). It had been pulled from the wall (RR 58 at 188, 201, 201). EMS arrived and transported the victims to a life flight landing zone (RR 58 at 32, 33).

Angleton EMS paramedics responded to the call involving the victims (RR 57 at 108, 113, 114, 143, 146). They observed the elderly man and woman in the kitchen of the house with multiple stab wounds (RR 57 at 117, 122, 123, 150, 153,

154). The victims had clothes line tied around their neck, arms, and waist (RR 57 at 127, 151, 152). The kitchen was covered in blood (RR 57 at 118, 12, 156). The man was begging for them to take care of his wife (RR 57 at 120, 121). At one point, blood was spurting from the man's chest as his heart beat (RR 57 at 123, 124). The victims were life-flighted to Hermann Memorial Hospital (RR 57 at 124, 128, 129, 158-160). Mrs. Wilcox had 18 stab wounds to her legs, under her armpit and to her back (RR 57 at 165, 166). The wounds were life threatening (RR 57 at 166). Later, it was determined that she had 24 stab wounds (RR 59 at 197).

Shortly afterward, police located the victims' vehicle at the Biz Bar near the Economy Inn, a nearby motel (RR 58 at 33, 34, 67-72, 78). The Economy Inn was about 3.4 miles from the Wilcox's residence (RR 59 at 202). A K-9 unit arrived within minutes (RR 58 at 35-37). The dog tracked the suspect from the vehicle to the south row of the motel (RR 58 at 81-83)(RR 59 at 140-146). The officers determined they needed to search all the units for public safety and got permission to do so from the manager (RR 58 at 37, 38, 83). They got a master key from him (RR 58 at 41, 83). At that time, the Appellant was in the manager's office and appeared to be nervous. He overheard the Officers talk of searching the rooms and said he was not sure if he wanted his room searched (RR 58 at 39-41, 84, 85) (RR 58 at 60, 61). He advised he was in Room 35 (RR 58 at 41, 86). The Officers began searching the rooms. When the Officers got to Room 35 (the Appellant's

3

room) they found a knife in the toilet (RR 58 at 44, 45, 49, 94, 95). The Appellant was then detained. He was not intoxicated (RR 58 at 57, 58, 97, 99, 127, 132).

Crime scene investigation recovered a cordless phone with power cord, two camo jackets, rope, a shirt, a one dollar bill, and swabs from the victim's house (RR 58 at 140-142, 144, 145-149, 159, 202-207). A search warrant was executed on the Appellant's room and a knife was recovered from the toilet and a camo jacket was recovered from the room (RR 58 at 142, 149, 150, 159)(RR 59 at 159-162). Buccal swabs and nail clippings were recovered from the Appellant and $350.00, with blood on it, was recovered from the motel manager. The manager had kept the Appellant's partial payment separate from other money collected (RR 58 at 150-152, 211, 231-233)(RR 59 at 211). Swabs were also taken from the victim's vehicle (RR 58 at 152, 153, 227). A buccal swab was taken from Darla Wilcox and a blood card and clippings were taken from Alton Wilcox (RR 58 at 156, 156, 157, 242, 243).

After being advised of this rights, the Appellant gave a statement to police, but did not admit commission of the offense (RR 59 at 152-157)(ST-X 100). He was not intoxicated (RR 59 at 154, 155). In a later statement to the police he admitted to the stabbings. He told the police that he pushed his way into the house when Darla Wilcox opened the door. He admitted stabbing Darla and Alton and taking $410.00 from them. He said he needed the money because he was locked

4

out of his motel room and needed to pay the rent. After he stabbed Darla and Alton, he took their car, and drove it to a club by the motel. He used $350.00 of the money to pay his rent and claimed that the knife used fell into the toilet when he used the bathroom (RR 59 at 184-190)(ST-X 101). The Appellant was not intoxicated when he gave this statement (RR 59 at 188, 209).

Darla Wilcox was 71 years old at the time of trial (RR 60 at 12). She testified that before the murder, her husband, Alton, had injured himself in a fall. He had to use a walker or a cane to walk after the accident. (RR 60 at 24, 31, 32). He could not get up without help. He also had heart problems (RR 60 at 33-35). Alton had two children, two grandchildren, and three great grandchildren (RR 60 at 17). He was a veteran of WWII (RR 60 at 20).

On the day of the murder, Darla was helping Alton put his pants on when the doorbell rang. She went to open the door (RR 60 at 46). She looked through a small window and saw a black male in a camo jacket. She thought the man at the door was a friend of her husband's and opened the door (RR 60 at 52). The man asked several times if her husband was there and she told him that he could not come because he was getting dressed and was hurt. The man then pushed his way into the house (RR 60 at 53). When she pushed against him, he pulled out a knife and began stabbing her (RR 60 at 55). When she fell to the floor, he demanded she

give him $500.00. She told him they did not have $500.00 (RR 60 at 58, 68). She kicked at him as he continued to stab her legs on the floor (RR 60 at 58, 69).

Alton came down the hall. The Appellant ran toward him and stabbed him multiple times in the chest (RR 60 at 59-62). Darla then got up and grabbed the Appellant's arm for as long as she could. But he began stabbing her again (RR 60 at 65, 66). He stabbed her in the mouth, ear, arm, shoulder, and back many times and she fell down in the hallway (RR 60 at 67, 68). She thinks the Appellant also continued to stab Alton while he was on the floor (RR 60 at 70). She told him that if he stopped, she would get him some money (RR 60 at 71). Bleeding, she got to her purse in the kitchen, but she only had a dollar in the purse. Alton was crawling beside her (RR 60 at 71-73). She showed the Appellant the dollar and he said that would not do. She then went to the silverware holder and gave him about $270.00 (RR 60 at 74-76). She also told him where to look for Alton's billfold (RR 60 at 82, 84).

The Appellant then pulled the phone off the wall and tried to yank the cord out of the wall. He asked for tape and she told him to look in the garage (RR 60 at 76-79). He came back and tied them up with tomato cord (RR 60 at 79-81, 86). He tied them up with their hands behind their back (RR 60 at 84). He told them that if they called the police, that he would come back and kill them (RR 60 at 87). He then left through the kitchen door and Darla heard their car pull out of the garage.

6

Earlier, she had told him where her keys were located (RR 60 at 87, 89). Darla and Alton owned a 2005 Chevrolet Impala. She identified State's 31 as the vehicle the Appellant took (RR 60 at 37, 98).

She was able to get one hand loose and get to her cell phone to call 911 (RR 60 at 89, 90). After the police arrived, she lost consciousness (RR 60 at 92). She remembers the EMS coming. The next day, she found out that Alton died (RR 60 at 92, 93). She was in the hospital for seven days (RR 60 at 95).

Sukhvinder Singh was the manager of the Economy Motel where the Appellant lived (RR 61 at 6-9). On January 13, 2012, he padlocked the Appellant's room, number 35, because he was behind on rent. But he opened the room when the Appellant promised to pay him the next day (RR 61 at 10). He then padlocked the room again because he did not get back with him. When the Appellant later gave him $350.00 in cash, he opened the room again (RR 61 at 14, 15). He acted normal and was calm when he paid him (RR 61 at 17). The Appellant did not appear to be intoxicated (RR 61 at 44). Sukhvinder put the money inside the bottom of the register and kept it separate from the rest of the money. The police later came and took the money (RR 61 at 17, 18). The Appellant was in camo when he paid him (RR 61 at 20). Cameras at the motel show the Appellant pulling into the motel in a Chevrolet. They also show the Appellant paying the manager and throwing something in the trash. A video of the recordings was played for the

7

jury (RR 61 at 19, 22-28). The Appellant was a good tenant and did not cause any trouble. He was friendly and polite (RR 61 at 41, 42).

Deputy Chief Medical Examiner Dwayne Wolf performed the autopsy on Alton Wilcox (RR 60 at 105, 110). Mr. Wilcox died of multiple sharp force injuries (RR 60 at 111, 112, 131). He had an incised wound on the right upper lip; a stab wound on the right side of the chin; a stab wound on the right side of the chest; and three stab wounds on the left side of the chest. Another stab wound was incorporated into a midline thoracotomy incision by doctors (RR 60 at 112-117). The stab wound to the right chest penetrated two inches and collapsed the right lung (RR 60 at 120, 121). One of the stab wounds to the left side of the chest penetrated three inches and perforated the left ventricle of the heart (RR 60 at 122-124). These wounds were consistent with those inflicted by a knife such as State's 38-A, the one found in the Appellant's motel room (RR 60 at 132) (RR 58 at 149, 150). The manner of death was homicide (RR 58 at 132).

Dr. George Tyson was the emergency room doctor who treated Alton Wilcox when he was brought in on January 14, 2012 (RR 67 at 5, 6, 11, 12, 13). Mr. Wilcox had multiple stab wounds and blood in the left chest. One stab wound was just left of the midline. At one point that wound started spurting blood up to 3 feet (RR 67 at 13, 16, 37). Another wound had penetrated his lung (RR 67 at 31). Mr. Wilcox had a prior open heart procedure which caused scar tissue that made

8

his internal parts stick together (RR 67 at 17, 18). However, in Dr. Tyson's opinion, the scar tissue slowed down the bleeding, preventing him from dying at the scene (RR 67 at19). A CT scan was done of the chest and it indicated an injury to the left ventricle of the heart (RR 67 at 20, 21). Because of the prior open heart procedure, the right ventricle was stuck to the sternum (RR 67 at 25).

Mr. Wilcox suffered a lethal injury. He had a hole in his heart that had to be closed (RR 67 at 36). Time was of the essence. His symptoms indicated he had lost over half his blood volume. The procedure to repair the heart was very risky and had a very low probability of success (RR 67 at 38, 39, 41). Looking at the options, he decided to do a direct sternotomy. He consulted with Dr. Red Duke to determine the best approach (RR 67 at 74). All of the options were bad (RR 67 at 43-46). There were problems with doing either a left lateral approach or an anterior lateral thoracotomy (RR 67 at 66, 70, 71). As soon as he entered the chest, the right ventricle tore open because it was stuck to the sternum and there was nothing further he could do for Mr. Wilcox. But if he had done nothing, the patient would also have died (RR 67 at 47).

Dr. Joseph Love treated Darla Wilcox at the hospital (RR 63 at 10, 16, 17). She had bilateral pneumothoraces, a significant laceration to her face, displacement of her jaw, a fracture to the spine, and multiple stab wounds to her legs, face, back, side, and chest. She was in between Stage III and Stage IV hemorrhagic shock (RR

9

63 at 19, 20, 24, 25, 48). She had lost more than half of her total blood volume when she arrived. She was dying (RR 63 at 22-24). Without medical treatment she would have died (RR 63 at 30, 68). As a result of her wounds, she may have breathing problems for the rest of her life and may also experience post-traumatic stress disorder (RR 63 at 39).

DNA analysist Rachel Burch testified that blood found on the knife found in the Appellant's motel room matched that of Alton Wilcox and Darla Wilcox (RR 59 at 87, 88, 90, 100-106, 113, 114). Blood found on money held by the motel manager matched Darla Wilcox (RR 59 at 94-97, 114-116). Blood on the steering column of the victim's vehicle and blood on the camo jacket located in the Appellant's motel room also matched that of Darla Wilcox (RR 59 at 81, 82, 98, 99 117-119). Swabs from the cuffs and liner of the camo jacket matched that of the Appellant (RR 59 at 119-122, 125).

Jenna Dunton with the Department of Public Safety Crime Lab in Houston also did a DNA analysis of some of the money recovered from the Appellant's motel manager's office. Blood found on the money matched that of Darla Wilcox (RR 60 at 155, 163-165, 177).

The Appellant was previously on two years' probation for felony theft in 1980 (RR 63 at 234, 235). He was also convicted of misdemeanor assault causing bodily injury in 1995 (RR 63 at 260-268); criminal trespass in June and November

of 2003 (RR 63 at 270-273); failure to identify in 2009 (RR 63 at 274-278); theft by check in 2005 (RR 63 at 287-290); and false report to an officer of a stolen vehicle in 2003 (RR 63 at 290-294). In 1991 the Appellant was placed on seven years' probation for forgery (RR 64 at 186, 189). His performance on probation was terrible and he was revoked (RR 64 at 191-195). During the period that he was on probation he never complained of nor mentioned exposure to pesticides or other toxins (RR 73 at 193, 194). In 1995 he was convicted of injury to a child and sentenced to four years imprisonment (RR 64 at 198-202). He had burned a child with a cigarette, hit him with a belt, and dropped him on the floor (RR 64 at 204).

Louis Brown, who is retired from Dow Chemical, testified that on January 14, 2012 (the date of the murder) the Appellant walked over to him while he was outside. He asked him how he was doing then turned and left. His neighbor, Mr. McFatter had come up at about the same time (RR 63 at 112,117-120, 147, 148). Two days earlier the Appellant had asked for money because he said he was being thrown out of his house. Mr. Brown gave him twenty dollars on the condition he not come back (RR 63 at 114, 115).

Eugene McFatter, who is also retired from Dow Chemical, noticed the Appellant, dressed in camo, walking around his yard and peering into Louis Brown's yard. This was on January 14, 2012 (RR 63 at 124-126, 132, 134). He then saw the Appellant come out of Mr. Brown's carport. When the man headed

11

toward Mr. Brown, he decided to also walk to him. They arrived at the same time (RR 63 at 127, 128). The Appellant asked Mr. Brown how he was doing and walked off (RR 63 at 128). The Appellant did not seem happy to see him (RR 63 at 129).

Joseph Williams, an elderly man, testified that over about a two year period the Appellant borrowed over $40,000.00 from him (RR 64 at 10, 11, 14-19, 29). The Appellant said he needed money for union dues; food and rent; to pay for his grandparent's funeral; because he had to take care of his sister's children after she died; for funeral expenses for a person killed at the docks; for medicine for a girlfriend; to fix broken pipes; and for school supplies and clothing (RR 64 at 11-14, 29-37). Mr. Williams was 78 years old at the time of trial (RR 64 at 7).

Marlin Lincoln was a Longshoremen and knew the Appellant since 2000. They worked together (RR 62 at 27-29). The Appellant was qualified as a forklift operator. (RR 62 at 31). He never complained of being exposed to toxic chemicals (RR 62, at 32). Work was available without problem for longshoremen (RR 62 at 33). Mr. Lincoln visited the Appellant in Jail on January 19, 2012 (RR 62 at 37). The Appellant told him the Wilcoxs would not give him money and he just snapped and that he needed money to pay rent (RR 62 at 42, 43). At a later visit he stated that he did not feel bad and had no remorse about what happened (RR 62 at 49). A tape of the visit was played to the jury (RR 62 at 45-48). Mr. Lincoln had

loaned him money in the past and the Appellant had always paid him back (RR 62 at 51).

Michael Anderson worked with the Appellant as a longshoreman during the 1980's to early 2000's. The Appellant did not complain of any mental or physical problems. When Mr. Anderson visited the Appellant in jail he told him that he could sleep well at night (RR 71 at 164-166). The Appellant also stated that he had a good job as a longshoreman and had made good money (RR 71 at 172).

Anna Meeks testified that at one time she had a romantic relationship with the Appellant. She visited him at the jail on several occasion since his arrest for this offense (RR 65 at 163, 164). During one visitation he told her that if he had to do it over again, that he would. That it needed to be done. He said he just popped like a twig. He told her he should not have done it, but it was too late for that. He said he had been in jail for 19 days and that was 19 days too long (RR 65 at 166, 167). A recording of the visit was played for the jury (RR 65 at 170). During a later visit he told her that what was happening to him did not bother him. He also told her that he did not have to do what he did because he had a job (RR 65 at 177). He told her that if he got out of prison, her boyfriend should feel real threatened (RR 65 at 180). On a number of occasions he asked her to give money to the jail for his use at the commissary. She did give him some money (RR 65 at 171, 177, 181, 182). On another visit he said that the offense was just something that happened.

He did tell her that he was remorseful about committing the murder and that he was paying the consequences for it: that he lost her and his family and that he did not have the right to take another life (RR 65 at 185, 186). Ms. Meeks said he was never violent with her and she was shocked to hear he committed the murder (RR 65 at 184).

Stephanie Trevino worked for a shipping company at the Port of Freeport. She is married to Frank Trevino and knows the Appellant who also worked at the port (RR 64 at 167, 168, 170, 171). In 2009 they let the Appellant live at their apartment for three weeks and fed him during that period (RR 64 at 171). When they all got paid, they cashed their checks. Stephanie put her money in her purse. When they got home, they discussed the Appellant leaving. He left shortly afterward (RR 64 at 172-174). That night, she left her purse on the kitchen counter and the next day it was gone. They noticed that the back door had been broken (RR 64 at 174, 175). When they confronted the Appellant about the purse, he initially denied stealing it, but then admitted to it. He took them to the trash bin where he threw the purse away and recovered it for her, but claimed he no longer had the approximately $620.00 that was inside. They reported the theft to the Freeport Police (RR 64 at 176, 177).

On April 28, 2012, the Appellant was involved in a fight in the jail. The other inmate had a cut lip, but the Appellant had no injuries. The Appellant was

verbally challenging toward the jailer who handled the fight. He attempted to intimidate the jailer (RR 63 at 215-221, 223). On June 22, 2013, the Appellant was caught masturbating, in public, in jail, while watching TV in an eight man tank (RR 63 at 139-142). The Appellant received disciplinary action for this conduct (RR 63 at 143, 144).

While in the Texas Department of Criminal Justice facilities, the Appellant received a number of disciplinary actions. He received discipline for seven separate acts of masturbation in public from 1996 to 2001 (RR 65 at 124, 125, 127, 128, 133, 135, 137). In 2002, he received a forfeiture of privileges and good time for threatening to inflict harm on a fellow inmate (RR 65 at 126). He also received discipline for sexual misconduct in 1996 and 2001 (RR 65 at 129, 130). He was disciplined for being involved in a fight in 1996 (RR 65 at 137). Finally he was disciplined in 1996 for possession of contraband socks and towel taken from a jail (RR 65 at 139, 140).

In the past, the Appellant was on probation. During his personal background interview, the Appellant told probation officer Mack Selman, that he was raised by his biological parents; that he had a good childhood; that he was not abused by either one of his parents; and that he was basically satisfied the way that he got along with people. But he said that he was not a trusting person. He would not change anything about his childhood (RR 64 at 226, 227).

*Defense Evidence*

The Appellant called his younger sister, Carolyn Duplechin. She is an occupational health nurse (RR 68 at 5, 39). She described how their family grew up poor in Boling, Texas. Their father was a sharecropper and their mother a housekeeper for white people. Race was an issue (RR 68 at 5, 6, 8-13). Their father would drink and go out with other women (RR 68 at 13). He had health problems (RR 68 at 15). The father left the family when the Appellant was 17 years old. He died a few years later (RR 68 at 18, 19). When the Appellant was in high school, he was in a car accident in which his ankle was crushed. He had been a good football player with a potential for a scholarship, but he was not able to play after the accident (RR 68 at 20-23). The Appellant worked in the fields for three years from the time he was seven until he was ten (RR 68 at 25, 27). His sister related how a number of people in his family died (68 at 13, 28-30). Ms. Duplechin suspected the Appellant was a crack addict (RR 68 at 33). In January of 2012, the Appellant worked as a longshoreman and doing odd jobs (RR 68 at 36). He did not get in fights at school. He was well liked and not violent. She was shocked to hear he committed the murder (RR 68 at 37, 38). But when she visited him at the jail, he told her that his conscience did not bother him and that he could sleep at night (RR 68 at 39).

Carmen Harris, the Appellant's niece, stated that when she was young, the Appellant used to give her family money. That he was a kind person and never violent or aggressive (RR 71 at 93-98).

Floyd Owens, the Appellant's cousin, could not believe the Appellant was the type of person who would commit this type of crime. But he was also not aware that the Appellant had been in trouble with the law (RR 68 at 93, 95-99). He stated that no one in their family commits crime because they were raised not to (RR 68 at 101).

David Laws, a childhood friend, said that the Appellant was a happy guy who had a great personality (RR 68 at 104, 105). They had all the necessities growing up, but nothing more. The Appellant was not aggressive or violent in school. He was always jovial (RR 68 at 110, 111). He had heard the Appellant was addicted to crack, but he could not believe the Appellant committed the murder (RR 68 at 111). He said that if the Appellant would have needed something, he would have been there for him (RR 68 at 113).

Travis Farris had a relationship with the Appellant for almost a year in 1995. She testified that he never assaulted her. He did not complain of mental problems or being exposed to chemicals or toxins, but he did drink quite a bit (RR 70 at 98-101). She admitted that the Appellant was arrested for assaulting her daughter (RR 70 at 101, 104, 105). Investigator Paige Newsome later testified that Travis Farris

17

was the complainant in an assault with family violence charge on July 2, 1995 which resulted in the Appellant's arrest (RR 73 at 136-139).

Mirk Adams owned a mobile home park and the Appellant worked doing odd jobs for him for about 6 or 7 years beginning in 2005 (RR 68 at 125, 126,130). The Appellant would borrow money from him and then work it off. But the Appellant always kept a balance owed (RR 68 at 131). Sometimes the Appellant got a little desperate for money, but he was not angry or violent. Mr. Adams heard the Appellant had a drug problem, but he did not know this firsthand (RR 68 at 133, 134). No one complained about him (RR 68 at 138). He did have to watch the Appellant, however, because he would do work for other people when he was supposed to be working for Mr. Adams (RR 68 at 133, 134). When the Appellant stopped working for him, he left without paying Mr. Adams $500.00 that he owed (RR 68 at 141).

Bobbie Franklin employed the Appellant to do yard work for her. He worked for her for about three years beginning in 2009 (RR 68 at 149, 150). She said the Appellant was nice to her and never intimidating. She was shocked to hear of the murder (RR 68 at 154, 155).

The Appellant did yard work for Cheryl McDonald for a year or two before the murder. She was satisfied with his work. He seemed friendly and she did not feel threatened. She was very surprised to hear of the murder (RR 68 at 229-234).

Her husband, Wilkins McDonald said he never had any problems with him and was shocked when he heard of the murder. He did not see that the Appellant had any tendency toward violence (RR 68 at 239, 241, 242, 243). He was not aware that he had a drug or alcohol problem although one time he looked intoxicated on beer (RR 68 at 241, 242).

George and Catherine Bettany used the Appellant to do handiwork over about a ten year period ending in 2009 (RR 68 at 249, 250, 253, 260). They were surprised to hear about the murder (RR 68 at 251, 262). It seemed out of character (RR 68 at 262).

Horace Lemons knew the Appellant for six years and worked with him at the Port of Freeport (RR 70 at 167, 168). The Appellant was jovial and kind; got along with everybody; and was a good worker. Mr. Lemons never saw him violent or angry (RR 70 at 169, 170). The Appellant was a forklift operator and was able to do physical work. He never complained of having a mental illness or not being able to do physical work or being exposed to toxic chemicals (RR 70 at 174, 175).

Kenneth Murray was also a longshoreman at the Port. He grew up with and worked with the Appellant (RR 70 at 180-182). The Appellant was a good worker and they kidded around a lot. He was not violent or aggressive (RR 70 at 182, 183). He heard the Appellant was a crack addict but he had no personal knowledge

of it (RR 70 at 184). He found it unbelievable that he committed this offense (RR 70 at 184).

Longshoreman Santos Aluiso also worked with the Appellant (RR 70 at 192, 194). The Appellant was friendly, a good worker, playful, and never violent (RR 70 at 195-197). Mr. Aluiso testified that if the Appellant needed any money, that he would have provided it (RR 70 at 199).

Longshoreman Tyrone Ward also worked with the Appellant. He said he was jovial, popular, and was not violent (RR 70 at 205-207). When he heard of the offense, he was angry because the Appellant did not have to commit the offense (RR 70 at 208). He never saw the Appellant on drugs at work (RR 70 at 209).

Longshoreman Patrick Taylor also worked with the Appellant. He knew him as outgoing, funny, popular, and a good worker. He was not violent or aggressive. He said the Appellant told him he was sorry for what he did (RR 70 at 214-216). He never saw the Appellant under the influence of drugs (RR 70 at 218).

Longshoreman Mike Riva also worked with the Appellant. He said the Appellant was normally a good worker. He was friendly and made a lot of jokes. He was not violent. But he did not come to work every day. Mr. Riva was surprised to hear he committed this offense (RR 70 at 225-228). He said there were times he thought the Appellant was under the influence of drugs (RR 70 at 229, 230).

20

Longshoreman Marcus Lincoln also worked with the Appellant. He stated that the Appellant was funny, popular, and a good worker (RR 70 at 252, 255). He was not violent or aggressive (RR 70 at 257). He said he had a conversation with the Appellant on the phone and the Appellant told him that he had made his peace with God and prayed that God would forgive him (RR 70 at 256). He said that being a longshoreman is a good job with good benefits. The Appellant had a good job available to him (RR 70 at 263-265). The Appellant never complained of being mentally ill, having any physical problems, or being exposed to toxins or pesticides (RR 70 at 264, 265). He had friends at the port who would have lent him money if he needed it (RR 70 at 265).

Longshoreman Marlin Lincoln also knew the Appellant. The Appellant was a hard worker and nice guy who did not lose his temper (RR 70 at 234-236). He was helpful to other people (RR 70 at 237-239). Mr. Lincoln could not believe the Appellant committed the offense (RR 70 at 239). The Appellant had a good job at the Port and never complained of health problems, any mental problems, or being exposed to toxic chemicals (RR 70 at 243). He had friends at the port who could have helped him (RR 70 at 244). Mr. Lincoln visited the Appellant at the jail and the Appellant told him some things that disturbed him. Appellant said he did not feel bad about what happened and had no remorse about it (RR 70 at 245-246).

Mr. Lincoln initially gave money to the jail for the Appellant's use there, but at one point he told the Appellant to stop calling him for more money (RR 70 at 247).

Jail inmate Shane McCain said that the Appellant was kind to him and would read him the letters he got. The Appellant would calm him down and tell him not to get himself in trouble (RR 71 at 14, 17, 18). He also said the Appellant was able to read and write and function mentally (RR 71 at 20).

Jail inmate Marquis Thomas said that the Appellant was very helpful in keeping him out of trouble and fights. He said the Appellant would refer him to the Bible and calm him down. They had prayer circles before going to court (RR 71 at 21, 23-25).

Jail inmate Juan Morales said the Appellant calmed him down and ran their prayer circle. He read the Bible every day and prays. He was not violent or aggressive (RR 71 at 35-38).

Jail inmate Troydrick Hill said the Appellant helped him keep his cool. He participated in the prayer circle and was not violent or aggressive (RR 71 at 45-48). Mr. Hill said the Appellant told him he had made a terrible mistake and the people he hurt did not deserve what happened to them. He made this statement while the jury in his case was being picked (RR 71 at 50, 51).

Walter Farrell was a defense expert. He had a Bachelor's degree in geography with minors in English and education. He had a Master's in urban

geography and a Ph.D. in urban social geography with minors in American history, sociology, and education (RR 68 at 162, 164). He claimed the Appellant's drug use and negative peer pressures, together with being raised in a dysfunctional family caused him to move in a negative direction. (RR 68 at 183-191). In his opinion, low self-esteem, poverty, negative relationships, unrealized dreams, family tragedies, drugs, economic issues, and a tenuous connection with reality, together with drug and alcohol abuse drove him to commit this crime (RR 68 at 196-202).

However, Mr. Farrell was not a psychologist or a medical doctor (RR 68 at 208). He has never testified for the State. He was paid $175.00 per hour for his work (RR 68 at 209, 210). He did not talk with any of the police or probation officers involved in this case or involved with the Appellant (RR 68 at 211, 212, 214, 216). He admitted that a lot of people grew up in poverty with dysfunctional families and were fine (RR 68 at 216, 226).

Defense expert, Mary Kasper was a clinical psychologist (RR 72 at 5, 6). She performed a neuropsychological evaluation of the Appellant (RR 72 at 18-34). His parole records indicated he had an IQ of 83. In her opinion, he suffered from a mild cognitive impairment (RR 72 at 35). She said he would be able to function well in the prison system (RR 72 at 40). She was not a medical doctor or a neurologist (RR 72 at 48, 49). The Appellant reported that he always had enough to eat growing up; that it was very often true he had someone to take care of him

23

and protect him; that his family was not demeaning of him; that his parents were never too drunk or high to take care of him; and that he had family members who helped him feel he was important and special (RR 72 at 54-56, 58, 61, 62). He reported that it was often true that he felt loved (RR 72 at 57, 59, 69). He was not physically or sexually abused (RR 72 at 57-59, 61). He reported that he had a very good childhood (RR 72 at 59, 60).

Defense expert Raymond Singer was a neuropsychologist and a neurotoxicologist. He had a Ph.D. degree in psychology (RR 73 at 47). He was paid $350.00 per hour to testify with a $30,000.00 cap (RR 73 at 56, 57). He later stated that he had almost reached his cap of $30,000.00 prior to testifying (RR 73 at 122). He noted that Dr. Kasper testified that the Appellant had a minor cognitive impairment and assessed his IQ at 75 (RR 73 at 59). In his opinion, the Appellant had a major neurocognitive disorder resulting from exposure to neurotoxic chemicals: specifically exposure to pesticides from working on the farm between the 3rd and 6th grade; hydrogen sulfide fumes, solvents, and lead from working in a mining facility; the accidental release of an unknown gas at the Phillips 66 plant; welding fumes; and cocaine (RR 73 at 68, 71-74, 76-78).

But Mr. Singer was not a neurologist nor a radiologist nor a psychiatrist nor a licensed medical doctor (RR 73 at 91). He obtained his information regarding exposure from the Appellant, not from independent sources (RR 73 at 92, 97, 104,

24

110, 111, 112). No blood testing was done on the Appellant for exposure (RR 73 at 101). Mr. Singer admitted that his testimony had been excluded on a number of other occasions in different courts (RR 73 at 124-129).

Defense expert, Dr. Kevin Barrett was a certified emergency room doctor (RR 69 at 31, 33, 36). He reviewed the emergency room medical records of Alton Wilcox (RR 69 at 42). He concluded that if Dr. Tyson had used a left lateral thoracotomy procedure, that Mr. Wilcox may not have died. He claims this was a survivable wound (RR 69 at 49, 71, 75, 76). He admitted he did not talk to either Dr. Tyson or the medical examiner about the case (RR 69 at 78). He is neither a cardiologist nor a trauma surgeon (RR 69 at 97). He admitted that the last thoracotomy he did was in the late 1980's and that he had never done this procedure on a person who previously had a heart bypass (RR 69 at 105, 109).

John Cosper was a retired county extension agent with a Bachelor's Degree in agronomy and a Master's in plant pathology. He testified as to the pesticides used in the Boling, Texas area in the 1960's and early 1970's. (RR 70 at 137, 138, 142, 143). He said it is not safe to use some of these chemicals (RR 70 at 144). But he did not know if the Appellant was exposed to any of these chemicals. (RR 70 at 151, 164). He admitted he had no training in the medical field (RR 70 at 164).

Defense expert Robert May was an actuary (RR 70 at 42, 43). Looking at different factors he was given, he determined that on average, the Appellant would

live about eleven more years. (RR 70 at 50-52). He was charging between $8,000.00 and $9,000.00 for his services (RR 70 at 60). He received the information used in making this determination from defense counsel (RR 70 at 72).

Former defense counsel and judge, Kevin Fine, related to the jury his experience with drug and alcohol abuse and how it destroyed his life (RR 71 at 145-153). He did not know the Appellant and knew nothing about the Appellant's use of drugs (RR 71 at 158).

## SUMMARY OF ARGUMENT

### *First Point of Error*

The Appellant claims the trial court erred in allowing the State to impeach Mr. Raymond Singer, an expert witness, with prior incidents in which his testimony as an expert was disallowed by other courts. He claims the prior determination by the trial judge that his testimony was admissible prevented this impeachment. However, the admission of this evidence did not prevent the impeachment of this witness. The trial judge, as gatekeeper, determines the reliability, relevancy, and admissibility of scientific evidence. The jury, however, is the sole judge of a witnesses' credibility and the weight to be given his testimony. The trial court's determination that Mr. Singer's testimony was admissible under Rule 705 did not inoculate him from impeachment to test his credibility as an expert.

26

Moreover, even if the impeachment had been improper, the Appellant can show no harm. First, the witness' conclusion that the Appellant's mind was affected by different environmental toxins was very speculative and poorly based. Second, the Appellant brought out in his direct examination that Mr. Singer's testimony had been excluded in other courts. The impeachment was proper, and at worst, any error would be harmless.

### Second Point of Error

The Appellant claims that the trial court erred in including in the punishment jury charge language stating that the Appellant appeared to the Court to be competent and sane at the time of his plea of guilty. He claims it was a comment on the weight of the evidence. Said statement was proper to inform the jury that the court had complied with the applicable law under Article 26.13 of the Code of Criminal Procedure. That article requires the trial court to find that a defendant pleading guilty is mentally competent and his plea is free and voluntary. In addition, the language in article 36.14 of the Code of Criminal Procedure prohibiting comment on the weight of the evidence is specifically excepted from application where the defendant pleads guilty and a jury is waived. In this case, the complained of language only applied to the guilt/innocence stage and the defendant had plead guilty and waived his right to a jury as to this stage of trial.

Moreover, even if there had been error in including this language, it would have been harmless. The Appellant claims that harm was created because part of his mitigation claim included that the Appellant had mental problems. But this reference in the charge applies to a different time period and purpose than that applicable to punishment. The language in the charge refers to the Appellant's competence and sanity *at the time of his plea of guilty* and relates to whether his plea was freely and voluntarily entered into. The Appellant's mitigation claim before the jury was that he was morally less responsible for this horrific murder because he had mental problems *at the time of the commission of the offense*. The charge language refers to a different time period and purpose than that in issue at punishment. Moreover, competence and sanity are different concepts than mental illness. The included language was proper and caused the Appellant no harm.

### Third Point of Error

The Appellant claims that the trial court erred in not striking venireperson Brenda Woods for cause, in that her beliefs regarding the death penalty substantially impaired her ability to assess punishment. At one point, in response to defense questioning, she did indicate that under certain hypothetical circumstances, she would automatically make a finding for death. But the totality of her answers show these were not her beliefs. In fact she repeatedly stated that she would not automatically make a finding of death and would keep her mind open. At worst,

28

she was a vacillating venireperson and the trial courts determination of her fairness should be deferred to.

Moreover, even if she would have exhibited a bias, there would be no error. During this portion of her questioning, she never stated that she could not set aside any bias if instructed to do so. As such she could not be struck for cause. The trial court did not abuse its discretion in denying the Appellant's challenge for cause.

### *Fourth Point of Error*

The Appellant claims that the trial court erred in failing to strike juror Stephanie Cooper for cause, in that her beliefs regarding the death penalty substantially impaired her ability to assess punishment. The Appellant complains of three statements by this venireperson. First, during defense questioning she said that it "makes more sense" and "seems more humane" to sentence a person to death than to give him life without parole for the rest of his life. But she also stated she would consider both options based on the information presented. Second, she stated that if a defendant takes a life, he or she should pay with his own life. She based this on religious beliefs. But she added that she would follow the law and stated, "The Bible says an eye for an eye, but …, Jesus also said if someone strikes you once, then turn the other cheek, too. So I think I could consider all the options in front of me and really weigh the information before making a judgment on someone else's punishment." She stated that if a defendant is found guilty of

capital murder, then death is appropriate, but not if there are sufficient mitigating circumstances. Third, she stated that she thought the death penalty should be available for all murders, but stated that it would not be fair to judge the Appellant until she had heard all the evidence and that she would followed the law. She also stated that it was important to be fair.

Although a juror might express strong feelings for imposing the sentence of death, he is not disqualified as a matter of law from serving as a juror in a capital murder case if he can set aside those feelings and follow the trial court's instructions on the law and would base his verdict or his answers to the special issues on the evidence adduced. Ms. Cooper repeatedly stated that she could follow the law. At worst, she was a vacillating venireperson and the trial court's determination of her fairness should be deferred to. The trial court properly denied the challenge for cause.

### *Fifth Point of Error*

The Appellant claims that the trial court erred in failing to strike juror Brenda Lee for cause, in that her beliefs relating to disregarding an illegally obtained confession and the death penalty substantially impaired her ability to assess punishment. The Appellant's claim involves three answers by this venireperson.

30

First, in response to Appellant's questioning, she stated that she could not say 100% that she could completely disregard an illegally obtained confession. But she stated that she would try her best to disregard it and that was the best answer she could give. However earlier, she stated on several occasions that she could disregard an illegally obtained confession. She said this in response to both the State's and Appellant's questioning. At worst venireman Lee vacillated, leaving the judge in the best position to determine if she had a bias against the law which would substantially impair her ability to follow instructions. In addition, she never clearly stated that she could not set aside an illegal confession if instructed to do so. As such she could not be struck for cause.

Second, the Appellant claims that because venireperson Lee stated that she believed in an "eye for an eye" and a "life for a life" that she could not properly consider the range of punishment. But her statement must be viewed in context. She stated that she believed in an "eye for an eye" or a "life for a life," but not literally; rather every crime deserves a punishment. She stated this did not necessarily mean the death penalty should be assessed. Moreover, both during questioning by the State and the defense, she repeatedly stated that she could consider either life or death as an appropriate punishment. Venireperson Lee was not disqualified on this basis. At worst, she was a vacillating juror, such that the appellate court should defer to the trial courts determination regarding bias.

Third, she stated that if she found a defendant guilty of capital murder and found him to be a future danger, that she had doubts whether she could consider any circumstances mitigating. But she later clarified, that she would consider mitigating evidence, but she did not know what the mitigating evidence would be. Moreover, she previously stated on several occasions that she could consider mitigating evidence. Again, at worst, she was a vacillating juror such that the appellate court should defer to the trial court's determination. In addition, she never clearly stated that she could not consider mitigating evidence if instructed to do so. As such she could not be struck for cause. The trial court did not abuse its discretion in denying the challenge for cause.

### Sixth Point of Error

The Appellant claims that the trial court erred in failing to strike juror Donna Vanscoy for cause, in that her beliefs regarding the death penalty substantially impaired her ability to assess punishment. The Appellant's sole complaint is that during defense questioning, she stated if a person killed two people in committing capital murder that the only penalty would be death and that the death penalty would be automatic. However, shortly after making this statement, she said she could find the Appellant was not a future danger under special issue one in a case in which two people were murdered. She also stated that after finding a defendant was guilty and finding him to be a future danger that she could find that there was

32

sufficient mitigation to give him life without parole. The record shows confusion rather than bias.

Moreover, during this portion of her questioning, she never stated that she could not set aside any bias if instructed to do so. As such, she could not be struck for cause. At worst, she was a vacillating venireman and deference should be given to the trial court's determination that she was not biased such as to substantially impair her ability to follow the law.

### *Seventh Point of Error*

The Appellant claims the trial court erred in failing to allow him additional peremptory challenges after he ran out of peremptory challenges. The Appellant could show no basis to obtain additional strikes. To show error, the Appellant must show that he was deprived of a peremptory challenge because the judge improperly overruled a proper challenge for cause and thereby forced him to use a peremptory strike on a juror who was subject to challenge for cause. There was no basis to the Appellant's claim because the trial judge properly overruled his challenges for cause for Michael Martinez as well as venirepersons Brenda Woods, Stephanie Cooper, Brenda Lee, and Donna Vanscoy (discussed in prior points of error). The trial court properly overruled the Appellant's motion for additional peremptory challenges.

***Eighth Point of Error***

The Appellant claims the trial court erred in not allowing him to ask venireperson Donna Vanscoy, "[w]here would you expect the mitigation to come from." First, the trial court properly limited the Appellant's question as repetitious. Prior to the complained of question, this venireperson was asked essentially the same question three times and she answered that she would not require the Appellant to present mitigating evidence.

In addition, the judge may have viewed the question as an improper commitment question. This vague question, "where would you expect the mitigation to come from," could be easily interpreted by the venireperson as asking what evidence she would expect to be presented to show mitigation. As such, it would be an improper commitment question. The law does not require that a juror consider any particular piece of evidence as mitigating. This type of vague question was impermissible because it amounted to a "global fishing expedition." Moreover, any error in disallowing this question would be harmless considering that essentially the same question was asked and answered by this venireperson. The trial court did not abuse its discretion in disallowing this vague repetitious question.

*Ninth Point of Error*

The Appellant claims the trial court erred in disallowing his question to venireperson Stephanie Cooper. After giving her a detailed hypothetical set of facts, he asked her: "What are your feelings in that hypothetical about the death penalty being the only appropriate remedy for that guilty murderer?" This question was a poorly veiled attempt to ask an improper commitment question. A commitment question is improper unless it includes only those facts necessary to lead to a valid challenge for cause. The real question Appellant was asking was "do you think the death penalty is the only appropriate punishment given the stated set of facts." The Appellant merely added the words "what are your feelings" in an attempt to avoid a *Standefer* objection. This type of vague question was impermissible because it amounted to a "global fishing expedition."

Even had there been error, it would have been harmless. There is no harm in this question being disallowed, because other proper questions asked by the parties covered the same material as the improper question asked by the Appellant. The trial court did not abuse its discretion in disallowing this question, and even if there had been error, it would have been harmless.

*Tenth Point of Error*

The Appellant claims the trial court erred in disallowing his question to venireperson Audrey Holt asking her whether she thought most of the community

favored the death penalty. This question failed to seek the venireperson's views as to an issue applicable to the case. It did not ask the juror her personal views regarding the death penalty; but instead, asked her information regarding the community's views of the death penalty. A trial court commits no error by excluding questioning which is inapplicable to the case. A juror's belief as to whether the community is in favor of the death penalty was irrelevant to any issue in the Appellant's trial. The trial court did not abuse its discretion in disallowing this question.

Even if the Court were to find the Appellant's question to be proper, the trial court's disallowance of the question was not harmful. Here, venireperson Holt stated that she would keep an open mind as to whether life imprisonment was appropriate based on the evidence presented. There was no evidence presented at trial regarding any community expectation of punishment nor was there argument by either party on this subject. The trial court did not abuse its discretion in disallowing this question, and even if there had been error, it would have been harmless.

## STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR

The Appellant claims the trial court erred in allowing the State to impeach Dr. Raymond Singer, an expert witness, with prior incidents in which his testimony as an expert was disallowed by other courts. The State had the right to test the witness' credibility through this means of impeachment. Moreover, even if there had been error, it would have been harmless.

## DISCUSSION

The State was properly allowed to cross examine Dr. Singer regarding the prior occasions in which other courts had excluded his expert testimony. Prior to trial, the trial judge determined Dr. Singer's testimony to be admissible regarding the effects of the Appellant's supposed exposure to toxic substances. After Dr. Singer testified, the State was allowed to cross examine him regarding four instances in which other courts had excluded his testimony.

*Relevant Facts*

Prior to trial, the Court conducted a Rule 705 hearing to determine the admissibility of Dr. Singer's testimony outside of the jury's presence. Dr. Singer testified he had a Ph.D in psychology; a postdoctoral fellowship in environmental epidemiology; was board certified in neuropsychology; and was a member of a) the Society of Toxicology, b) the American Academy of Clinical Toxicology and c) the National Academy of Neuropsychology (RR 73 at 6-11). He claimed Mr.

37

Harris suffered from brain damage from exposure to numerous toxic substances, particularly from childhood agricultural exposure, resulting in major neurocognitive disorder. He also considered the Appellant's use of cocaine in reaching this conclusion (RR 73 at 14, 15). He based his opinion on information provided to him by the Appellant (RR 73 at 24). He claimed the Appellant was affected by exposure to agricultural pesticides as a child; exposure to hydrogen sulfide and lead from working at a sulfur plant; lead exposure from working at a refinery; and the recreational use of cocaine (RR 73 at 23-27).

The State pointed out that Dr. Singer was not a medical doctor, nor a radiologist, nor a neurologist (RR 73 at 19); that there is no license for a neurotoxicologist (RR 73 at 17); and that Dr. Singer was charging approximately $30,000 for his services (RR 73 at 19-21). During cross examination at the Rule 705 hearing, the State questioned him regarding five occasions in which his expert testimony was disallowed (RR 73 at 27-32). At the conclusion of the hearing, the Judge allowed his testimony to be presented to the jury, but also allowed the State to impeach him with instances of prior exclusions of his testimony from other jurisdictions. This was over defense objections (RR 73 at 41, 42).

Before the jury, Dr. Singer testified that in his opinion the Appellant's brain has been damaged by exposure to neurotoxic chemicals. He claimed that this exposure resulted in a major neurocognitive disorder. The symptoms would

38

include problems with executive function, as well as loss of cognitive function reflected in a reduced IQ (RR 73 at 77, 78). He claimed that pesticides the Appellant was exposed to between the third and sixth grades damaged his brain (RR 73 at 63-68). He also claimed the Appellant's brain was affected by hydrogen sulfide and lead when the Appellant worked at the New Gulf sulfur mining facility between the ninth and twelfth grades (RR 73 at 71, 72). In addition, he claimed the Appellant suffered brain damage from the release of an unknown chemical at the Phillips 66 refinery. He also stated the Appellant was also exposed to mercury, lead, phosgene, chlorinated hydrocarbon solvent, and carbon monoxide from welding. He said these substances are detrimental to the brain (RR 73 at 73-76). He added that the Appellant's use of cocaine also damaged his brain (RR 73 at 77).

The Appellant presented evidence that Mr. Singer testified as an expert on over 20 but fewer than 50 occasions. The witness admitted on direct that his testimony was excluded on several occasions (RR 73 at 52). On one occasion, his testimony regarding EMF (electromagnetic radiation) in a civil case did not come in. There was a problem with EMF as a subject matter (RR 73 at 52, 53). On another occasion, his testimony regarding Picloram neurotoxicity was excluded (RR 73 at 53). Another court would not let him testify regarding mold. Finally, his testimony in a civil case regarding refrigerant gas was excluded by another jurisdiction (RR 73 at 53, 54). As to the last case, the Judge excluded his testimony

based on the exclusion of other testimony he partially relied on to form his opinion (RR 73 at 54).

On cross examination he admitted he was not a neurologist, nor a radiologist, nor a psychiatrist, nor a medical doctor (RR 73 at 91). He did not travel to Wharton County to determine what pesticides they used during the time the Appellant was exposed to them (RR 73 at 92). He took the Appellant's exposure history from him about 14 days prior to his testimony (RR 73 at 97). No blood testing or MRI was done of the Appellant (RR 73 at 102). He did not talk to other individuals regarding the pesticides the Appellant was exposed to as a child, but did receive summaries from the Appellant's defense team of what other individuals stated that he may have been exposed to (RR 73 at 104). He did not confirm with the person that sprayed the fields what was used (RR 73 at 105, 106).

Only the Appellant provided him with information regarding his exposure to welding fumes and to the claim that he was exposed to the accidental release of an unknown gas at the Phillips plant (RR 73 at 110, 111). Dr. Singer also did not verify the Appellant's drug use with other individuals. He did not talk to anyone at Phillips 66 regarding his exposure to lead by sandblasting (RR 73 at 111, 112).

The Appellant complains because the State then questioned Dr. Singer regarding four different occasions in which his testimony had been excluded by other courts. In *Viterbo v. Dow Chemical*, the plaintiff sued Dow Chemical in

federal court in the 1980s based on exposure to the herbicide, *Tordon K*. Dr. Singer was hired as an expert by the plaintiff. His scientific testimony was excluded by the court (RR 73 at 124-127). In the 2012 *Firstenburg* case in New Mexico, Dr. Singer's testimony was also excluded. Mr. Firstenburg was suing his neighbor claiming the neighbor exposed him to electromagnetic radiation from cell phone usage (RR 73 at 127, 128). His testimony was also excluded in the United States Court of Appeals for the Fourth Circuit in the case *Deborah Zellers vs. Rite Aid of Virginia*. Ms. Zellers was suing her employer for refrigerant exposure. Dr. Singer was to provide expert testimony that Ms. Zellers had a nervous system dysfunction from neurotoxicity caused by poisoning with refrigerant containing fluorocarbons (RR 73 at 128, 129). Finally, his testimony was excluded in a California case in which he was to testify as an expert regarding the neurotoxicity from mold exposure (RR 73 at 129).

*Analysis*

The Appellant claims that because the trial court made a finding that Dr. Singer's testimony was admissible under Rule 705 that it was improper for the State to impeach his testimony with prior occasions in which his testimony was disallowed. He is confusing admissibility with credibility. While the trial court is charged with determining the reliability, and thereby, the admissibility of expert testimony; the credibility of that testimony is determined by the jury. Under

41

Appellant's defense theory, whenever the trial court determines the initial admissibility of expert testimony, it would create an irrebuttable presumption that the testimony was credible.

Credibility and reliability are not the same. A jury is charged with determining credibility, but unreliable evidence should never make it to the jury. *Vela v. State*, 209 S.W.3d 128, 135-136 (Tex. Crim. App. 2006); *State v. Smith*, 335 S.W.3d 706, 714 (Tex. App. – Houston [14th Dist.] 2011, *pet. ref'd*). The trial judge, as gatekeeper, determines the reliability, relevancy, and admissibility of scientific evidence. *Id.* The jury, however, is the sole judge of a witness's credibility and the weight to be given his testimony. **Tex. Code Crim. Proc. 38.04 (Vernon 2007); *Brooks v. State***, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Mooney v. State*, 888 S.W.2d 182, 183 (Tex. App. – Houston [1st Dist.]1994, *no pet*.). The trial court's determination that Mr. Singer's testimony was admissible under Rule 705 did not inoculate him from impeachment to test his credibility as an expert.

In *Sparks v. State*, 943 S.W.2d 513 (Tex. App. – Fort Worth 1997, *pet. ref'd*), the defendant complained that the State should not have been able to impeach their intoxilyzer expert using testimony from that expert from another trial. He complained on the basis of several legal theories, including that the impeachment was on a collateral matter and that the expert was improperly

impeached regarding specific instances of conduct. The Court of Appeals held the impeachment was proper. *Id.* at 515-517. The Court noted that great latitude is allowed in the cross examination of witnesses. *Id.* at 516. In *Mauldin v. State*, 14-08-00419-CR, 2010 WL 1486959 (Tex. App – Houston [14th] April 15, 2010, *no pet.*)(not designated for publication), the defendant complained of the State's impeachment of their expert at the punishment phase of trial. The State cross examined the expert as to the punishment that he recommended in a different case. The Court of Appeals held the impeachment was proper. *Id.* at *2-4. The Court noted that under Rule of Evidence 611(b) a party may cross examine a witness on any matter as to any issue in the case, including credibility. *Id.* at *4. A trial court has discretion regarding the extent of cross-examination of a witness subject to abuse of discretion. *Id.*; *See Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1996), *cert. denied*, 118 S.Ct. 557 (1997). The impeachment was proper in the instant case.

The Appellant briefly mentions that the State never proved that the cases used for impeachment were of the same type as the instant case. But the record reflects that all the cases dealt with some form of neurotoxicity, although based on different causes. The Appellant also briefly mentions that the jury was never informed of the legal findings of the trial court that Dr. Singer's testimony was admissible. The Appellant was not entitled to this charge because such a charge

would be an improper comment on weight of the evidence by the Judge, *See* **Tex. Code Crim. Proc. 38.05 (Vernon 1997); Tex. Code Crim. Proc. 36.14 (Vernon 2007)**; *Matamoros v. State*, 901 S.W.2d 470, 477 (Tex. Crim. App. 1995) (instruction that the admission of DNA does not vouch for its reliable, constitutes an impermissible comment on the weight of the evidence because it singles out a particular piece of evidence for special attention); *Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007) (defendant not entitled to jury charge that focuses the jury's attention on a specific type of evidence). Moreover, the Appellant cites no legal authority that he was entitled to such a charge, so this claim is inadequately briefed. *See Vuong v. State*, 830 S.W.2d 929, 240 (Tex. Crim. App. 1992), *cert. denied*, 113 S.Ct. 595 (1992).

*Harm*

Even if the impeachment of Dr. Singer would have been improper, any error would have been harmless. Harm for the improper impeachment of a defense witness is governed by Rule 44.2(b) of the Rules of Appellant Procedure. *See Lopez v. State*, 990 S.W.2d 770, 777-778 (Tex. App. - Austin 1999, *no pet.*) (Rule 44.2(b) applied to improper impeachment of defendant with non-moral turpitude misdemeanor convictions). Under this Rule: "Any other [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." **Tex. R. App. Proc. 44.2(b) (Vernon 2003)**. "A 'substantial right' is

44

affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." ***King v. State***, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In considering harm, the entire record must be reviewed to determine whether the error had more than a slight influence on the verdict. ***Id.*** at 271. The Court should consider: (1) the strength of the evidence presented during punishment; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during argument. *See **Petriciolet v. State***, 442 S.W.3d 643, 654 (Tex. App. – Houston [1st Dist.] 2014, *pet. ref'd*.).

It is difficult to see how the impeachment would have injured the Appellant. Dr. Singer's testimony was speculative at best. There was no direct evidence that the Appellant was exposed to any harmful chemicals, much less that this exposure would have affected the Appellant in any significant way. His evaluation of the Appellant's exposure history was derived from information from the Appellant; that is, hearsay from an interested party (RR 73 at 97). No blood testing or MRI was done of the Appellant (RR 73 at 102). Dr. Singer did not talk to other individuals regarding the pesticides the Appellant was exposed to as a child, but only received summaries from the Appellant's defense team of what other

individuals stated that he may have been exposed to (RR 73 at 104). He did not confirm what pesticides were used with the person who sprayed the fields (RR 73 at 105, 106). Only the Appellant provided him with information regarding his exposure to welding fumes and to the claim that he was exposed to the accidental release of an unknown gas at the Phillips plant (RR 73 at 110, 111). Dr. Singer also did not verify the Appellant's drug use with other individuals. He did not talk to anyone at Phillips 66 regarding his exposure to lead by sandblasting (RR 73 at 111, 112).

He admitted that he was not a neurologist, nor a radiologist, nor a psychiatrist, nor a medical doctor (RR 73 at 91). Given the weakness of Dr. Singer's testimony, it is difficult to see how the Appellant would have been injured by cross examination that his testimony was excluded on a small number of occasions. Moreover, the record reflects that Mr. Singer testified as an expert on over 20 but fewer than 50 occasions (RR 73 at 52). The fact that his testimony was excluded on four occasions would have little impact. Further, the Appellant notes in his brief that the cases used to impeach Dr. Singer did not involve the same types of cases as the instant case (Appellant's brief, p. 13). This statement further emphasizes that his testimony had little effect before the jury.

Finally, there was no harm because this same evidence was presented to the jury by the defense on direct. Dr. Singer admitted on Appellant's direct

46

examination that his testimony was excluded on several occasions (RR 73 at 52). He admitted his testimony regarding EMF (electromagnetic radiation) in a civil case did not come in. He said there was a problem with EMF as a subject matter (RR 73 at 52, 53). He further admitted his testimony regarding Picloram neurotoxicity was excluded (RR 73 at 53). Another court would not let him testify regarding mold. Finally, he admitted that his testimony in a civil case regarding refrigerant gas was excluded by another jurisdiction (RR 73 at 53, 54). As to the last case, the trial Judge excluded his testimony based on the exclusion of other testimony he partially relied on to form his opinion (RR 73 at 54).

Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove. ***Anderson v. State***, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986). The Appellant complains of the admission, through cross, of the same prior exclusions of this witness' testimony. This case is similar to ***Petriciolet v. State***, 442 S.W.3d 643 (Tex. App. – Houston [1st Dist.] 2014, *pet. ref'd*). In *Petriciolet*, the Court of Appeals found that the State had improperly admitted expert testimony during the punishment phase in an aggravated assault case that the defendant scored high for the potential for future violence. The Court found this testimony failed under the *Kelly* test for reliability. However, the court found no harm in its admission because substantially the same evidence was admitted

47

through other witnesses of specific acts of violence by the defendant. *Id.* at 654, 655. In the instance case, the identical impeachment testimony that the Appellant complains of on appeal was brought out by defense questioning on direct examination. Even if there had been some error in the admission of this testimony, it would be harmless.

**STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR**

The Appellant claims that the trial court erred in including in the jury charge that the Appellant appeared to the Court to be competent and sane at the time of his plea of guilty. Said statement was proper to inform the jury of the applicable law under Article 26.13 of the Code of Criminal Procedure. Moreover, even if there had been error in including this language, it would have been harmless.

**DISCUSSION**

The Appellant complains that the Judge improperly included language in the jury charge noting that the Judge received the Appellant's plea of guilty to capital murder, after he appeared to be "competent and sane" (C.R. 4 at 115). He claims that this statement was a comment on the weight of the evidence. First, the statement was proper to apprise the jury of the applicable law under Article 26.13 and to comply with that statute. Second, Article 36.14 of the Code of Criminal Procedure does not apply to comment on the weight of guilt/innocence evidence where the defendant pleads guilty. Moreover, even if the inclusion of this statement in the charge had been error, it would have been harmless.

*Relevant Facts*

The Appellant plead guilty to the offense of capital murder, but requested a jury assess his punishment. The jury charge begins with the Judge informing the jury of his guilty plea and setting out the charges. It then continues:

49

To this charge the defendant has pleaded "GUILTY" and he has persisted in entering such plea notwithstanding the Court, as required by law, had admonished him of the consequences of the same; and it plainly appearing to the Court that the defendant is competent and sane and that he is not influenced to make this plea by any consideration of fear, nor by a persuasive or delusive hope of pardon prompting him to confess his guilt, said plea is by the Court received.

You are therefore instructed to find the defendant guilty of capital murder, as charged in the indictment. (CR 4 at 115).

The defendant objected to the above language after the semicolon as a comment on the weight of the evidence. (RR 74 at 10).

*Analysis*

The above language was proper to apprise the jury of the applicable law under Article 26.13(b) and to comply with that statute. That article provides: "No plea of guilty or plea of nolo contendere shall be accepted by the court unless it appears that the defendant is mentally competent and the plea is free and voluntary." **Tex. Code Crim. Proc. Ann. art. 26.13 (Vernon Supp. 2014)**. The language was necessary to inform the jury that the defendant was properly found to be guilty in compliance with the law.

In *Morin v. State*, 682 S.W.2d 265 (Tex. Crim. App. 1983, the defendant plead guilty to capital murder and went to the jury for punishment. He claimed it was improper for the trial judge to instruct the jury to return a verdict of guilty. In its analysis of this issue, the Court noted that Art. 36.14 of the Code of Criminal Procedure, requires that the judge instruct the jury on the applicable law of the

50

case. *Id*. at 268. The jury charge in that case set out that defendant had pled guilty to the charge, that defendant was mentally competent, that the plea had been made freely and voluntarily, and that the court had received the plea. The Court of Criminal Appeals held that this language showed "compliance with Art. 36.14, in that the jury was given instruction on the law, applicable to the case, without comment on the weight of the evidence." *Id.* at 268. While the primary issue was different from the instant case, the legal analysis is on point. Unfortunately, aside from the *Morin* case, there appears to be no authority that addresses this issue.

Additionally, article 36.14 does not apply to charge language relating only to guilt/innocence where the defendant plead guilty. That article provides, "the judge shall, before the argument begins, deliver to the jury, ***except in pleas of guilty, where a jury has been waived***, a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." **Tex. Crim. Proc. Code Ann. art. 36.14 (Vernon 2007).** The complained of language in the jury charge only applied to the finding of guilt, not punishment. The clear language of article 36.14 provides that the rule against judicial comment does not apply where the defendant plead guilty and the jury was waived. In the instant case, the Appellant waived a jury on guilt/innocence. Therefore, the requirement

under article 36.14 that the jury charge not comment the weight of the evidence did not apply to the complained of language which only dealt with guilt/innocence. This makes sense because nothing concerning guilt is contested. Therefore, any comment by the judge on the guilt/innocence stage would have no effect on the jury's punishment deliberations.

It should also be noted that the complained of form is taken almost word for word from the Texas Practice Criminal Form jury charge applicable to guilty pleas. **8 Tex. Prac. Criminal Forms and Trial Manual §99.11 (11th ed.),** *McCormick, Blackwell, & Blackwell.*

*Harm*

Moreover, even if this charge language could be interpreted as a comment on the weight of the evidence, any error would be harmless. The complained of portion of the charge only related to the Appellant's guilt and would have no effect on the jury's determination of punishment. Here, there was an objection to the charge. Where a charge is the subject of a timely objection in the trial court, then reversal is required if the error is "calculated to injure the rights of defendant," which means that there must be some harm to the accused from the error. ***Brown v. State***, 122 S.W.3d 794, 803 (Tex. Crim. App. 2003), *cert. denied*, 124 S.Ct. 1678 (2004). A defendant must show actual, not merely theoretical harm. ***Reeves v. State,*** 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); ***Remsburg v. State***, 219

S.W.3d 541, 547 (Tex. App. - Texarkana 2007, *pet. ref'd*). The factors in determining the degree of harm are 1) the entire charge; 2) the state of the evidence including the contested issues and the weight of probative evidence; 3) the argument of counsel, and 4) any other relevant information revealed by the record of the trial as a whole. ***Reeves v. State,*** 420 S.W.3d at 816. In the instant case there was no harm.

The charge stated that the judge received the plea of guilty, "it plainly appearing to the Court that the defendant is competent and sane" (CR 4 at 115). He argues that harm was created because part of his mitigation claim was that the Appellant had mental issues. But he is comparing apples and oranges. First, the reference in the charge applies to a different time period and purpose than that addressed at punishment. The language in the charge refers to the Appellant's competence and sanity *at the time of his plea of guilty* and relates to whether his plea was freely and voluntarily entered into. The Appellant's mitigation claim before the jury was that he was morally less responsible for this horrific murder because he had mental problems *at the time of the commission of the offense*. The charge language refers to a different time period and purpose than that in issue at punishment.

Second, competence and sanity are different concepts than mental illness. It is not unusual for a person to have some form of mental disease and not be legally

53

incompetent or insane. A person is incompetent to stand trial if the person does not have: "(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." **Tex. Crim. Proc. Code Ann. art. 46B.003(a) (Vernon 2006).** A person is insane if "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong. The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." **Tex. Penal Code Ann. § 8.01 (Vernon 2011).**

On the other hand section 571.003 of the Health and Safety Code defines mental illness as: "an illness, disease, or condition, other than epilepsy, senility, alcoholism, or mental deficiency, that: (A) substantially impairs a person's thought, perception of reality, emotional process, or judgment; or (B) grossly impairs behavior as demonstrated by recent disturbed behavior. **Tex. Health & Safety Code Ann. § 571.003(14) (Vernon 2010).** While competency and insanity are subjects related to mental illness, they are entirely different concepts. There is nothing in the charge language (that the Appellant appeared to the court to be competent and sane at the time of the plea), which would have affected any mitigation argument that the Appellant was less morally responsible because he had a mental illness at the time of the offense.

While there is no case law relating directly to the facts of this case, ***Brown v. State***, 122 S.W.3d 794, 803 (Tex. Crim. App. 2003), *cert. denied*, 124 S.Ct. 1678 (2004) is somewhat analogous. In *Brown*, the following instruction was submitted to the jury over defense objection: "Intent or knowledge may be inferred by acts done or words spoken." The defendant argued this language was harmful because the only issue in the case was the defendant's intent. The Court of Criminal Appeals found this to be a comment on the weight of the evidence. However, it held that because the instruction was mild, neutral, and an obvious common-sense proposition, that the error caused no harm. *Id.* at 803. In fact, the court made a finding that the error was harmless without remanding the case to the trial court. *Id.* at 803, 804. In the instant case the instruction was likewise mild, neutral, and a common-sense proposition. *See also **Baggett v. State***, 367 S.W.3d 525 (Tex. App. – Texarkana, *pet. ref'd*) (error harmless where court defined "normal" in DWI case).

In ***Ross v. State***, 133 S.W.3d 618 (Tex. Crim. App. 2004 the defendant was charged with capital murder and sentenced to death. At the punishment phase of trial the Judge submitted a jury charge which erroneously suggested that he might be eligible for parole in less than forty years through the award of good conduct. But the same charge also instructed the jury not to consider the extent to which good conduct time might be awarded. The defendant timely objected to the charge.

The Court found no reasonable likelihood that the jury would misapply the charge and found the error to be harmless. *Id.* at 623, 624. Similarly there is no reasonable likelihood that the jury would misapply the statement, that the Appellant appeared competent and sane at the time Judge received the plea of guilty, in assessing punishment. The charge was properly given and even if there had been error, it would have been harmless.

## STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR

The Appellant claims that the trial court erred in failing to strike juror Brenda Woods for cause, in that her beliefs regarding the death penalty substantially impaired her ability to assess punishment. The record reflects that this juror did not have a bias regarding the death penalty which would have impaired her ability to assess a fair punishment.

## DISCUSSION

Brenda Woods did not have a bias regarding the death penalty which would have impaired her ability to assess a fair punishment.

### *Relevant Facts*

During voir dire, defense counsel gave Ms. Woods a hypothetical question in which a capital murder was committed; there was no self-defense; no mistake or accident; and the victim did not provoke the murder or in any way deserve to die. Counsel then asked what she thought about the statement that the death penalty was the only appropriate punishment under those circumstances. She answered that such a statement would be accurate (RR 26 at 103, 104). But she later clarified that the death penalty is not the only appropriate punishment for murder and whether the death penalty should apply depends on the circumstances of the case (RR 26 at 115, 116).

In his brief, counsel also claims Brenda Woods said that if one has a murder case, the best option is the death penalty (App. brief p. 23). Brenda Woods did not make this statement. Instead she stated that her best argument for the death penalty was: "If it's a murder case and then that's the option you have is the death penalty" (RR 26 at 114).

The Appellant also claims she stated that if she convicted a person of capital murder that she would have to find him to be a future danger (App. brief p. 23). She did not state this. In fact, she stated that she could envision herself answering Special Issue one "no" after finding the defendant had committed capital murder (RR 26 at 121, 124, 125). At one point, the venireperson may have been confused by the question, but her answer was later clarified (RR 26 at 121-123). She said she would keep an open mind on future danger until she heard all the evidence (RR 26 at 118, 119, 124). She could make a finding of mitigation on special issue two based on mercy alone (RR 26 at 130). She would consider evidence of low intellectual functioning; drug addiction; and brain damage in determining punishment (RR 26 at 130, 131).

Earlier, under Appellant's questioning, she stated that she disagreed with the statement that anyone convicted of capital murder should get the death penalty. The punishment would depend on the facts (RR 26 at 100, 101). She did state that

her feelings concerning the death penalty were strong and probably based on her father's views (RR 26 at 105, 106).

In many ways Ms. Woods had a lenient view of punishment. During voir dire, she stated that if she could change the justice system she would find alternative ways to rehabilitate defendants rather than incarcerate them, in order to keep cost down (RR 26 at 52, 53). She thought the death penalty was used too often (RR 26 at 97).

On the written questionnaire, she answered that she would consider all the penalties provided by law and the facts and circumstances of the particular case. She stated in open court that this was still her view (RR 26 at 53). Ms. Woods said that the death penalty is an appropriate punishment, "if the circumstance fits." In her opinion it is a just and necessary punishment, but is justified only for premeditated murder (RR 26 at 62, 63). She later clarified that it would be justified for an intentional murder committed during a burglary or a robbery (RR 26 at 63). She would consider the full penalty range for capital murder or the lesser offense of murder (RR 26 at 72-74).

Ms. Woods would not automatically give a defendant the death penalty if convicted of capital murder (RR 26 at 82). She would hold the State to its burden to show beyond a reasonable doubt that there was a probability that the Appellant would commit criminal acts of violence that would constitute a continuing threat to

society (RR 26 at 83, 84). She stated that she would not automatically sentence a defendant to death just because she found him to be a future danger. She would keep an open mind (RR 26 at 90). If the evidence showed sufficient mitigating circumstances under the second issue, she would not sentence the defendant to death (RR 26 at 95).

At the end of questioning, the Appellant challenged Brenda Woods for cause (RR 26 at 135). After both sides responded, the Judge overruled the challenge stating: "Considering the totality of it, her response to queen of the world was either. Her response to facts and circumstances, she did say to that first hypothetical that the answer would be the only appropriate; but I think that later on it came back that she clearly said she could consider all the facts and all the circumstances." After the State declined to strike Ms. Woods, the Appellant used a peremptory strike to remove her from the panel (RR 26 at 138, 139).

### *Standard of Review*

A venireperson is challengeable for cause if he has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Id.* The entire record is reviewed to determine if there is sufficient evidence to support

60

the trial court's ruling to deny a challenge for cause. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010), *cert. denied,* 132 S.Ct. 128 (2011

Before a prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Gardner* at 295. Finally, the proponent of a challenge for cause has the burden of establishing that the challenge is proper. *Id.* The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Id.* General questions about fairness and ability to follow the law and the court's instructions are not enough; the court must assess the effects of bias more specifically. *Gonzales v. State*, 353 S.W.3d 826, 841 (Tex. Crim. App. 2011).

When the record reflects that a venireperson vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge. *Gardner at 295.* A trial court's ruling on a challenge for cause is reviewed with considerable deference because the trial judge is in the best position to evaluate a veniremember's demeanor and responses. *Id*. at 295, 296. A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Id.* at 296. When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the Court gives particular deference to the trial court's decision. *Id.*

*Analysis*

The trial court did not abuse his discretion in denying the Appellant's motion to strike venireperson Woods for cause. At one point, in response to defense questioning, she did indicate that under certain hypothetical circumstances, she would automatically make a finding for death. But the totality of her answers show these were not her beliefs. In fact she repeatedly stated that she would not automatically make a finding of death and would keep her mind open. The trial court did not abuse his discretion in denying the defense motion, especially in light of the venireperson's vacillation.

Moreover, during this portion of her questioning, she never stated that she could not set aside her bias if instructed to do so. As such she could not be struck for cause. *See **Jones v. State***, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998), *cert. denied*, 120 S.Ct. 444 (1999); ***Gardner v. State,*** 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); ***Rachal v. State***, 917 S.W.2d 799, 814 fn. 15 (Tex. Crim. App. 1996), *cert denied*, 117 S.Ct. 614 (1996).

In ***Gardner v. State***, 306 S.W.3d 274 (Tex. Crim. App. 2009), venireperson Williams stated that she believed in the death penalty "if all the evidence is there." She described herself as being "tough" in holding people accountable. She stated that she would not give an automatic answer on the future danger and that she would give both the defense and the State a "fair shot" on the mitigation issue. But

when defense counsel gave her a hypothetical where the evidence showed an intentional killing during a burglary she stated this would automatically result in a finding of death. However, the Court of Criminal Appeals found from the entire record that this juror likely misunderstood the law, but in any case, she vacillated in her answers. The court found no abuse of discretion in the trial court's denial of the challenge for cause. *Id.* at 296, 297.

The defendant in *Gardner* also complained on the same basis about venireperson Crabtree. Ms. Crabtree stated in her questionnaire that death should be automatic in a murder involving burglary. In response to questioning by defense counsel, she repeated that death should be assessed in a murder involving burglary, stating that "nothing can bring the victim back." But she also said she would be open to considering mitigating circumstances and that she would not automatically give a verdict of death. The Court of Criminal Appeals found no abuse of discretion in the trial court's denial of the challenge for cause, finding that this was a vacillating juror and the trial judge was in the best position to determine if she could follow the law. *Id.* at 297, 298.

In *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010), *cert. denied*, 132 S.Ct. 128 (2011), venireperson Melero initially told defense counsel that death was the appropriate punishment for capital murder and that he would put the burden on the defendant to show that death should not be imposed. However

after the law was explained to him, he stated that he could set aside his personal feelings and follow the law. The Court of Criminal Appeals found the trial court did not abuse its discretion in denying defense counsel's challenge for cause. *Id.* at 808-810.

In *Bess v. State*, No. AP-76377, 2013 WL 827479 (Tex. Crim. App. Mar. 6, 2013), *cert. denied,* 134 S. Ct. 899 (2014) (not designated for publication), the defendant claimed venireperson Conradt would automatically vote to assess death if the defendant was found guilty. He also claimed the juror would not consider mitigation evidence. The venireperson stated that he strongly favored the death penalty and would lean toward death if the defendant was convicted. He stated that regardless of the mitigating evidence, there needs to be punishment; "a life for a life." But he also stated that he would listen to and be open to the evidence; that he had to follow the law; and that while he could not think of anything that might mitigate against death, he would be open to listening to the evidence. The court found no abuse of discretion in the trial court's denial of the motion to strike for cause. *Id.* at *21, 22. There was no abuse of discretion in the trial court's denial of the motion to strike.

**STATE'S REPLY TO APPELLANT'S FOURTH POINT OF ERROR**

The Appellant claims that the trial court erred in failing to strike juror Stephanie Cooper for cause, in that her beliefs regarding the death penalty substantially impaired her ability to assess punishment. The record reflects that this juror did not have a bias regarding the death penalty which would have impaired her ability to assess a fair punishment.

**DISCUSSION**

Stephanie Cooper did not have a bias regarding the death penalty which would have impaired her ability to assess a fair punishment.

*Relevant Facts*

The Appellant complains of three statements by this venireperson. First, in reply to defense questioning, she said that it "makes more sense" and "seems more humane" to sentence a person to death than to give them life without parole for the rest of their life. But she would consider both punishment options based on the information presented (RR 27 at 179). Second, she stated that if a defendant takes a life, he should pay with his own life (RR 27 at 182). She based this on religious beliefs. But she added that she would follow the law (RR 27 at 185, 186). She stated, "The Bible says an eye for an eye, but …, Jesus also said if someone strikes you once, then turn the other cheek, too. So I think I could consider all the options in front of me and really weigh the information before making a judgment on

someone else's punishment." (RR 27 at 186). She thought, the main argument against the death penalty is that an innocent person might be executed (RR 27 at 182). However if a defendant is found guilty of capital murder, then death is appropriate. But not if there are sufficient mitigating circumstances (RR 27 at 184).

Third, she stated that she thought the death penalty should be available for all murders (RR 27 at 184). But she also said it would not be fair to judge the Appellant until she had heard all the evidence and followed the law (RR 27 at 199). She stated that it is important to be fair (RR 27 at 200). While she leaned toward the death penalty, she felt she was fair (RR 27 at 201, 202).

Stephanie Cooper stated that she could consider both life imprisonment and the death penalty. She would not automatically assess the death penalty if the Appellant were convicted of capital murder (RR 27 at 127, 139, 140). She would keep an open mind (RR 27 at 128, 139, 140, 142). If the Defendant were convicted of the lesser offense of murder, she could consider the full range of punishment for murder (RR 27 at 129, 130). She did believe in the use of the death penalty as a punishment, but would consider both life without parole and the death penalty (RR 27 at 137, 138, 140, 141). She stated that she could separate her emotions from the legal instructions (RR 27 at 139). She would not make up her mind on punishment immediately after finding the Appellant guilty (RR 27 at 139, 140, 142). In assessing punishment she could consider all the evidence including evidence of the

66

Defendant's background and character; and the circumstances of the offense that mitigates against the imposition of the death penalty (RR 27 at 141, 142).

She would consider all the evidence in determining the first special issue on future danger (RR 27 at 143). She would hold the State to its burden to show beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society (RR 27 at 143, 148, 159). She would not automatically find future danger just because she found the Appellant guilty of capital murder (RR 27 at 148, 159, 164, 165). She agreed that not all people who committed capital murder would be a future danger (RR 27 at 149).

After finding the Appellant to be a future danger, she would still be open to either punishment (RR 27 at 150, 166, 167). She would still consider all the evidence at this point, including evidence of the Defendant's character and background; and the circumstances of the offense that mitigate against the imposition of the death penalty (RR 27 at 150, 151). She believed it was important to have this additional mechanism to spare the Appellant's life (R 27 at 151). She would not hold the Appellant to any burden to show mitigation (RR 27 at 152). She could consider all of the evidence and give effect to any mitigation found (RR 27 at 156, 157).

She could keep an open mind and honestly answer the special issues after finding the Appellant guilty of capital murder (RR 27 at 158, 159). She would still be able to find sufficient mitigation for life after finding the Appellant guilty and a future danger (RR 27 at 159, 160). Life without parole and death were both appropriate punishments (RR 27 at 160). In her opinion, if the defendant is guilty and there are not sufficient mitigating circumstances, then the death penalty is "warranted." If there is doubt about mitigation it would be unfair to give the death penalty (RR 27 at 162). She could keep an open mind on punishment even if there were no extenuating circumstances (RR 27 at 162, 163). Even if the Appellant were found guilty of Capital Murder, there was no justification, no excuse, an innocent victim, no provocation, and no doubt that he did it; she could still keep an open mind as to assessing life without parole (RR 27 at 163). She believed that the punishment process is fair and she would follow it (RR 27 at 164, 166). She believed that she would be fair (RR 27 at 166, 167).

At the end of questioning, the Appellant challenged this juror for cause. He used a peremptory strike against this venireperson after the Judge denied the challenge (RR 27 at 204, 206, 210). In denying the challenge, the court found that given the totality of answers, the juror could be fair (RR 27 at 212, 213).

*Standard of Review*

The caselaw cited in the third point of error is directly applicable to this point of error. Instead of repeating that information, the State would refer the Court to the analysis set out in that portion of this brief. The standard of review for determining when a veniremember is challengeable for cause for bias is: whether he or she has a bias or prejudice against the defendant or against the law which would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. The Standard is set out in detail in *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). When the record reflects that a veniremember vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge's determination, because he or she is in the best position to make this determination. *Gardner* at 295, 296.

*Analysis*

The trial court did not abuse his discretion in denying the Appellant's motion to strike venireperson Cooper for cause. Her statements were at worst mild and did not show substantial impairment to her ability to follow the law. Although a juror might express strong feelings for imposing the sentence of death, he is not disqualified as a matter of law from serving as a juror in a capital murder case if he can set aside those feelings and follow the trial court's instructions on the law and would base his verdict or his answers to the special issues on the evidence

adduced. *Cordova v. State*, 733 S.W.2d 175, 184 (Tex. Crim. App. 1987), *cert. denied*, 108 S.Ct. 2915 (1988). In *Cordova,* venireperson Guest stated that he believed that if a defendant were found guilty of a crime he should be punished in accordance with the Biblical admonition, "an eye for an eye and a tooth for a tooth." He believed that if one person murdered another person, then that person forfeited his life by his act of murder. *Id.* at 183, 184. But he later clarified that he would not automatically vote to assess the death penalty but would make that decision based upon the evidence given to him. He also stated that he would set aside his feelings and follow the law. The Court found the trial court did not abuse its discretion in denying the motion to strike this juror for cause. *Id.* at 184.

While some of Ms. Cooper's answers show a leaning toward the death penalty, none of her answers indicated that her beliefs would substantially impair her ability to follow the law in assessing punishment. In fact, she repeatedly stated that she could follow the law. The trial court did not abuse his discretion in denying the defense motion, especially in light of, what was at worst, juror vacilation. *See Id.*; *Gardner v. State*, 306 S.W.3d 274, 296-298 (Tex. Crim. App. 2009) *Davis v. State*, 329 S.W.3d 798, 807-810 (Tex. Crim. App. 2010), *cert. denied*, 132 S.Ct. 128 (2011); *Bess v. State*, No. AP-76377, 2013 WL 827479, at *21, 22 (Tex. Crim. App. Mar. 6, 2013), *cert. denied,* 134 S. Ct. 899 (2014) (not designated for publication).

Moreover, during this portion of her questioning, she never stated that she could not set aside her bias if instructed to do so. As such she could not be struck for cause. *See Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998), *cert. denied*, 120 S.Ct. 444 (1999); *Gardner v. State,* 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Rachal v. State*, 917 S.W.2d 799, 814 fn. 15 (Tex. Crim. App. 1996), *cert. denied*, 117 S.Ct. 614 (1996). The trial court properly denied the challenge.

**STATE'S REPLY TO APPELLANT'S FIFTH POINT OF ERROR**

The Appellant claims that the trial court erred in failing to strike juror Brenda Lee for cause, in that her beliefs as to disregarding an illegally obtained confession and her beliefs as to the death penalty substantially impaired her ability to assess punishment. The record reflects that this juror did not have a bias regarding these matters which would have impaired her ability to assess a fair punishment.

**DISCUSSION**

Brenda Lee did not have a bias which would have impaired her ability to assess a fair punishment.

*Standard of Review*

The standard of review set out in the third point of error is applicable to this point of error. Instead of repeating that information, the State would refer the Court to the analysis set out in that portion of this brief. The standard of review for determining when a veniremember is challengeable for cause for bias is: whether he or she has a bias or prejudice against the defendant or against the law which would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. The standard is set out in detail in *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). When the record reflects that a veniremember vacillated or equivocated on his ability to follow the law, the

reviewing court must defer to the trial judge's determination, because he or she is in the best position to make this determination. ***Gardner*** at 295, 296.

*Analysis*

The Appellant claims first that Venireperson Lee was biased because, first, she could not disregard an illegally obtained confession; second, she was biased toward death; and third, she could not consider mitigation evidence.

*Confession Bias*

The Appellant claims first that Venireperson Lee was biased because she could not disregard an illegally obtained confession. At one point during defense questioning, Venireperson Lee stated that she could not say 100% that she could completely disregard an illegally obtained confession; but that she would try to do so (RR 29 at 138). She stated that she would try her best to disregard it and that was the best answer she could give (RR 29 at 140). She did state that she would find the defendant not guilty if there was no proof beyond a reasonable doubt without an illegally taken confession (RR 29 at 141). After the Judge denied the challenge for cause, the Appellant used a peremptory challenge to strike the juror (RR 29 at 152, 153). The Judge found the venireperson's hesitation on some questions to simply be an indication of honest reflection that she would seriously consider the options in front of her (RR 29 at 152, 153).

Just before this questioning, she told defense counsel that she thought she could disregard a confession in which the police left out one warning even though the crime was horrific and she believed the confession. She was asked if she could follow an instruction to completely disregard an improperly obtain confession and she thought she could. In fact, during prior jury service, this issue came up and she was able to disregard the confession (RR 29 at 136-138).

First, it should be noted that after expressing doubt, she never clearly stated that she could not set aside an illegal confession if instructed to do so (RR 29 at 136-142). As such she could not be struck for cause. *See* ***Jones v. State***, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998), *cert. denied*, 120 S.Ct. 444 (1999); ***Gardner v. State,*** 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); ***Rachal v. State***, 917 S.W.2d 799, 814 fn. 15 (Tex. Crim. App. 1996), *cert. denied*, 117 S.Ct. 614 (1996). As in *Rachal*, this portion of the questioning does not specifically show that she could not follow an instruction to disregard if ordered to do so.

Earlier she agreed that, in the taking of a confession, it was important that a defendant be warned of his rights, those rights being: the right to remain silent, the right to stop questioning, that the confession could be used against him, the right to an attorney, and the right to appointment of an attorney if he could not afford one. It was also important that he knowingly, intelligently and voluntarily waive those rights. She felt it was important that the police play by the rules (RR 29 at 69). She

74

considered the warnings on a confession to be essential (RR 29 at 70). She specifically stated that she could disregard a defendant's statement if the police did not give the warnings or if the confession was involuntary (RR 29 at 70). The ends do not justify the means (RR 29 at 70, 71). When given the example of a confession involving a cold blooded killing, which contained gory details; the defendant enjoying the killing; no justification; and no self-defense, she stated she could disregard the statement if a warning was left off or it was involuntary (RR 29 at 71). She could find the defendant not guilty if the requirement of proof beyond a reasonable doubt was only met through the admission of an improper confession that she was required to disregard (RR 29 at 71, 72).

At worst venireman Lee vacillated, leaving the judge in the best position to determine if she had a bias against the law which would substantially impair her ability to follow instructions. In *White v. State*, 779 S.W.2d 809, 820 (Tex. Crim. App. 1989), *cert. denied*, 110 S.Ct. 2575 (1990), the defendant claimed the trial court erred in failing to grant a challenge for cause where a juror stated that he would "have a hard time" disregarding an illegally obtained confession. Because of the juror's inconsistent answers as to whether he could disregard such a confession, the appellate court deferred to the trial courts determination that he was not disqualified. *Id.* at 818-820; *See also Barney v. State*, 698 S.W.2d 114, 123, 124 (Tex. Crim. App. 1985)(juror vacillated as to disregarding illegal confession);

75

*Phillips v. State*, 701 S.W.2d 875, 886-888 (Tex. Crim. App. 1985), *overruled on other grounds*, 757 S.W.2d 744 (1988) (juror vacillated as to disregarding illegal confession); *McCoy v. State*, 713 S.W.2d 940, 942-945 (Tex. Crim. App. 1986), *cert. denied*, 107 S.Ct. 1590 (1987) (jurors vacillated as to disregarding illegal confession). The trial court did not abuse its discretion.

*Death Penalty Bias*

The Appellant next claims that because venireperson Lee stated that she believed in an "eye for an eye" and a "life for a life" that she could not properly consider the range of punishment. But this claim takes her statement out of context. She stated that she believed in an "eye for an eye" or a "life for a life," but not literally; rather every crime deserves a punishment. And this did not necessarily mean the death penalty (RR 29 at 131, 132). Venireperson Lee was not disqualified on this basis. *See Cordova v. State*, 733 S.W.2d 175, 184 (Tex. Crim. App. 1987), *cert. denied*, 108 S.Ct. 2915 (1988)(strong belief in capital murder did not disqualify juror who could follow the law).

Moreover, both on questioning by the State and the defense, she repeatedly stated that she could consider either life or death as an appropriate punishment. She believed there should be a death penalty, but believed that either life or death was appropriate in a capital murder case. She could consider the full range of punishment (RR 29 at 65-67).

She could consider both life imprisonment and death (RR 29 at 77). She would not automatically give the death penalty after finding the defendant guilty of capital murder. She would listen to the evidence (RR 29 at 78, 81). She would keep an open mind and listen to all the punishment evidence before making her decision (RR 29 at 78, 79). She stated she could consider all the evidence, including evidence of the Defendant's background or character or the circumstances of the offense, in determining punishment. She would not make up her mind before all the evidence was presented (RR 29 at 80, 81, 86).

She would require the State to prove the future danger special issue beyond a reasonable doubt. She would answer the question based on the evidence (RR 29 at 82, 83, 86, 87, 99). She would keep an open mind in answering this special issue (RR 29 at 86, 87, 97). She would not find future danger just because she found the defendant guilty of capital murder (RR 29 at 87, 90, 97, 98).

She would determine the case based on the law and the evidence and not on her emotions (RR 29 at 100, 101, 104). She would not determine punishment until she had listened to all the evidence (RR 29 at 100). In her questionnaire, she stated that the death penalty was necessary but needs to be used wisely (RR 29 at 101). She believed the penalty process is fair (RR 29 at 101). She would try to be fair (RR 29 at 102). She would keep an open mind through the penalty process (RR 29

77

at 103). She would keep an open mind and consider and give effect to any mitigating evidence (RR 29 at 104).

On questioning by the Appellant, she said she did not know whether she leaned toward giving the death penalty. She said that for some personalities, life imprisonment might be worse than death (RR 29 at 117, 118). She repeated that she would not automatically give the death penalty after finding the Appellant guilty of capital murder (RR 29 at 124). She agreed with counsel that the State had a difficult burden in proving future danger and she though they should have this burden (RR 29 at 125, 126). She repeated that she could find against a defendant being a future danger after finding him guilty of capital murder (RR 29 at 130). At worst, she was a vacillating juror, such that the appellate court should defer to the trial courts determination of bias. *See* ***Gardner v. State***, 306 S.W.3d 274, 296-298 (Tex. Crim. App. 2009) (appellate court should defer to trial court's determination of bias where juror vacillates).

*Mitigation Bias*

The Appellant next claims the trial court abused its discretion in denying his challenge to this venireperson as to mitigation. At one point venireperson Lee stated that while she thought she could consider mitigating circumstances, she had doubts (RR 29 at 146). But she later clarified:

Q. Guilty capital murderer, future danger. Would you ever consider anything that would lessen the blame of that person?

78

A. I think I could. You know, again, not being in the position, trying to forecast myself there, I would hope that I could still -- and I think I could still -- consider other circumstances, mitigating things that happen.
Q. Do you have doubts?

A. Yes, I do.

Q. Tell me about that.

A. I just -- it's hard for me to picture once coming to those two things that there is something out there. However, you know, it is a possibility that it's out there.

Q. Okay. You said it's hard for you to consider that?

A. It's just hard to think of it. Not consider. I mean, that's probably the wrong word. But it's hard to come up with it in my head right now. I can't imagine it.

Q. Okay.

A. But it doesn't mean it's not there.

….

A. I could consider it if I can see it. I mean, I don't know what it would be. I don't know what that mitigation could be. I don't know what it would be. I just don't. (RR 29 at 145, 146).

Viewing her statement in context, she is not stating that she could not consider mitigating evidence, but rather she was not sure what that mitigation evidence would consist of. Moreover, she earlier agreed with the procedure of using the mitigation issue as a mechanism to spare someone's life (RR 29 at 88). She said she could keep an open mind regarding mitigation after finding the

79

defendant guilty and finding that he would be a future danger (RR 29 at 89, 99). She would answer the mitigation special issue based on the evidence (RR 29 at 90, 91). She stated it was important to her to know the whole set of circumstances concerning the defendant before sentencing him to death or life imprisonment (RR 29 at 92). She would consider and give effect to all the evidence, including the circumstances of the offense, Appellant's character and background, and his personal moral culpability in determining if there was sufficient mitigation (RR 29 at 96). She could find sufficient mitigating evidence to give the Appellant life imprisonment (RR 29 at 98). She believed it is okay to find mitigation based just on mercy (RR 29 at 99). She could find for mitigation even after finding the Appellant was a future danger (RR 29 at 101). She stated that she liked the idea of the mitigation issue because she liked being able to consider all the circumstances (RR 29 at 143, 144).

It is important to note that the veniremembers were being subjected to long, tedious, and difficult questioning. The record reflects confusion rather than bias. The trial judge was in the best position to determine if there was bias. At worst, the venireperson is vacillating and deference should be given to the trial court. *See Gardner v. State*, 306 S.W.3d 274, 296-298 (Tex. Crim. App. 2009)(court found venireperson likely confused and at worst was vacillating); *Bess v. State*, No. AP-76377, 2013 WL 827479, at *21, 22 (Tex. Crim. App. Mar. 6, 2013), *cert. denied,*

80

134 S.Ct. 899 (2014)(not designated for publication)(no abuse of discretion by judge denying challenge on mitigation where vacillating venireperson).

Moreover, during this portion of her questioning, she never stated that she could not set aside her bias if instructed to do so. As such she could not be struck for cause. *See Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998), *cert. denied*, 120 S.Ct. 444 (1999); *Gardner v. State,* 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *Rachal v. State*, 917 S.W.2d 799, 814 fn. 15 (Tex. Crim. App. 1996), *cert. denied*, 117 S.Ct. 613 (1996). The trial court did not abuse its discretion in denying the Appellant's challenge to this juror for cause.

**STATE'S REPLY TO APPELLANT'S SIXTH POINT OF ERROR**

The Appellant claims that the trial court erred in failing to strike juror Donna Vanscoy for cause, in that her beliefs regarding the death penalty substantially impaired her ability to assess punishment. The record reflects that this juror did not have a bias regarding the death penalty which would have impaired her ability to assess a fair punishment.

**DISCUSSION**

Donna Vanscoy did not have a bias which would have impaired her ability to assess a fair punishment. The Appellant's sole complaint is that during defense questioning she stated if a person killed two people in committing capital murder that the only penalty would be death and that the death penalty would be automatic (RR 32 at 80, 81). She had her current view of the death penalty for the last twenty years and felt strong about her views (RR 32 at 82). At the end of questioning, Appellant challenged this venireperson for cause (RR 32 at 103). After the State declined to use a peremptory strike on this juror, the Appellant did use its strike. She was excused as a potential juror (RR 32 at 109).

But the total record shows confusion regarding the above question, rather than a bias affecting her ability to assess a fair punishment. Shortly after making the complained of statement, Donna Vanscoy said she could find the Appellant was not a future danger under special issue one in a case in which two people were

murdered (RR 32 at 91-93). She also stated that after finding a defendant was guilty and finding him a future danger she could find that there was sufficient mitigation to not give him the death penalty (RR 32 at 93, 94). Mitigation could be based on mercy alone (RR 32 at 97, 98). She would consider mitigation based on low intelligence or drug addiction, but not desperation (RR 32 at 100).

Earlier, during defense questioning she stated that if she found the Appellant guilty of capital murder and there was no self-defense, no provocation, and no insanity, then she felt the death penalty would be warranted unless there were mitigating circumstances. But she would look at all the evidence (RR 32 at 76, 77, 79). And she would not automatically give the death penalty (RR 32 at 80). In fact, on her juror questionnaire she checked that the death penalty should never be imposed if the alternative is life without parole (although she later stated she could impose the death penalty, but would need to hear the evidence) (RR 32 at 50).

During the State's questioning, Ms. Vanscoy stated that she would require the State to prove the elements of the offense beyond a reasonable doubt (RR 32 at 43-45). She could consider either life without parole or death in a capital murder case (RR 32 at 49). She stated that she would have an open mind on sentencing and consider both penalties after finding the defendant guilty of capital murder (RR 32 at 58, 59). She could consider all the evidence, including evidence of the Defendant's background, character, or the circumstances of the offense that

83

militated for or against the death penalty (RR 32 at 60). Before assessing the death penalty, she would require the State to prove beyond a reasonable doubt that there is a probability that the Defendant would commit acts of violence that would constitute a continuing threat to society (RR 32 at 60-63). She would make this determination based on the evidence (RR 32 at 63, 71).

She would keep an open mind regarding mitigation after finding the Appellant guilty of capital murder and finding him to be a future danger. In determining mitigation, she would consideration all of the evidence, including the circumstances of the offense; the Defendant's character and background; and the personal moral culpability of the Defendant. She would not require the Appellant to produce evidence of mitigation (RR 32 at 65-66). She thought it was good that mitigation could be based on nothing more than mercy (RR 32 at 69). She could find there was sufficient evidence to mitigate against the death penalty (RR 32 at 70). She could make this finding based on the evidence (RR 32 at 71, 72). She would keep an open mind and consider and give effect to mitigation evidence after finding the Appellant to be guilty of capital murder and finding that he was a future danger (RR 32 at 72, 73). She would keep an open mind and consider both penalties in the case of a brutal capital murder where there was no self-defense, no provocation from the victim, no insanity, and no excuse (RR 32 at 73, 74).

*Standard of Review*

The standard of review set out in the third point of error is applicable to this point of error. Instead of repeating that information, the State would refer the Court to the analysis set out in that portion of this brief. The standard of review for determining when a veniremember is challengeable for cause for bias is: whether he or she has a bias or prejudice against the defendant or against the law which would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. The Standard is set out in detail in *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). When the record reflects that a venireperson vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge's determination, because he or she is in the best position to make this determination. *Gardner* at 295, 296.

*Analysis*

The trial judge properly denied the Appellant's challenge for cause. The questioning shows this venireperson was confused rather than biased. *See Gardner* at 296-298 (Tex. Crim. App. 2009)(court found venireperson likely confused). At worst, she was a vacillating venireman and deference should be given to the trial courts determination that she was not bias, such as to substantially impair her ability to follow the law. *See Gardner* at 297, 298 (juror vacillated as to automatically giving the death penalty where murder occurred during burglary);

***Bess v. State***, No. AP-76377, 2013 WL 827479, at \*21 (Tex. Crim. App. Mar. 6, 2013), *cert. denied,* 134 S. Ct. 899 (2014)(not designated for publication), (juror vacillated as to whether he would automatically assess death if defendant was found guilty). The trial court properly denied the Appellant's challenge for cause.

Moreover, during this portion of her questioning, she never stated that she could not set aside her bias if instructed to do so (RR 29 at 136-142). As such she could not be struck for cause. *See* ***Gardner*** at 295; ***Jones v. State***, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998), *cert. denied*, 120 S.Ct. 444 (1999); ***Rachal v. State***, 917 S.W.2d 799, 814 fn. 15 (Tex. Crim. App. 1996), *cert. denied*, 117 S.Ct. 614 (1996).

**STATE'S REPLY TO APPELLANT'S SEVENTH POINT OF ERROR**

The Appellant claims the trial court erred in failing to allow the Defendant additional peremptory challenges after he ran out of peremptory challenges. The Appellant could show no basis to obtain additional strikes. The trial court properly refused his motion.

**DISCUSSION**

The trial court properly refused the Appellant's request for additional peremptory strikes. When the voir dire process reached venireman Martinez, the Appellant had run through his peremptory strikes. After the Judge denied the Appellant's challenge for cause for this venireman, the defense made a request for eleven additional peremptory strikes (RR 49 at 209, 220, 222). The Judge denied this motion and Mr. Martinez was seated as a juror (RR 49 at 231).

*Standard of Review*

Absent an abuse of discretion, a trial court commits no error by overruling a defendant's request for additional peremptory strikes after the he has exhausted those accorded him by statute. ***Thomas v. State***, 701 S.W.2d 653, 658 (Tex. Crim. App. 1985). A trial court abuses its discretion where it improperly overrules a defendant's challenge for cause and forces him to use a peremptory strike on a juror who was subject to challenge for cause. ***Id.***; *See also* ***Mooney v. State,*** 817

S.W.2d 693, 705 (Tex. Crim. App. 1991)(no error where defendant failed to show he was forced to exercise a peremptory challenge).

*Analysis*

In his brief the Appellant claims he was entitled to additional strikes because the trial judge improperly overruled his challenge for cause for venirepersons Brenda Woods, Stephanie Cooper, Brenda Lee, and Donna Vanscoy (Appellant's brief p. 40). These are the same individuals discussed in detail in Points of Error Three, Four, Five, and Six. The State would refer the Court to these prior Points of Error rather than repeat the same material here. As noted in those preceding points, the trial court did not abuse its discretion in denying the Appellant's challenge for cause for any of these venirepersons. The trial court, therefore, did not abuse his discretion in denying the Appellant's motion for additional strikes.

While not discussed in the Appellant's brief, there is one juror who was impaneled to whom the Appellant attempted to strike for cause. That juror was Michael Martinez (RR 49 at 209, 220, 222, 231). However, the Appellant failed to preserve his claim regarding Mr. Martinez, because he did not cite a legal theory as to why he should have been struck nor cite to supporting facts in the record. *See Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995) Out of an abundance of caution, the State will examine Juror Martinez.

*Juror Martinez*

There was no basis to strike Michael Martinez for cause. He stated that he would be fair and listen to all the facts before reaching a decision (RR 49 at 110). He agreed that the State had the burden to prove each element of the offense beyond a reasonable doubt (RR 49 at 115, 116, 119, 121). He would presume a defendant innocent until proven guilty (RR 49 at 118). He would not require the defendant to produce any evidence (RR 49 at 119, 120). He would not hold it against the defendant if he failed to testify (RR 49 at 120, 121). He could consider both life without parole and death as a punishment for capital murder (RR 49 at 125). Both punishments were appropriate (RR 49 at 126). He would disregard any statement given to police and not consider it for any purpose if it were improperly taken (RR 49 at 131-135, 141). He would find the Appellant not guilty if the only way the State could meet its proof was through an illegally obtained confession (RR 49 at 135, 136, 141).

He would keep an open mind and not automatically give the death penalty just because he found the Appellant guilty of capital murder (RR 49 at 142-144). All the evidence would be considered in determining punishment including evidence of the Defendant's background, character, or the circumstances of the offense (RR 49 at 143, 144). He would hold the State to its burden to show beyond a reasonable doubt that there was a probability that the Appellant would commit

acts of violence constituting a continuing threat to society before assessing death (RR 49 at 144, 145, 150-152). He would not automatically find the Appellant to be a future danger because he was found guilty of capital murder (RR 49 at 153). He agreed with the requirement to consider mitigation before imposing death (RR 49 at 154). He could consider and give effect to mitigation evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant (RR 49 at 154-161, 166, 167). If there was sufficient mitigation he would find against the death penalty (RR 49 at 160). He could find there was sufficient mitigation evidence even though he found the defendant guilty of capital murder and found that he was a future danger (RR 49 at 161, 162). He would keep an open mind and not lean toward either punishment until he heard any evidence of mitigation (RR 49 at 164, 165). He stated that he was neither generally opposed nor generally in favor of capital punishment (RR 49 at 166).

During defense examination, he stated he would not automatically find the Appellant was a future danger after finding him guilty of capital murder (RR 49 at 175, 176). No evidence would be expected from the defense (RR 49 at 176). He believed it is good that the State be required to prove future danger beyond a reasonable doubt and would hold the State to their burden (RR 49 at 177, 178). There was no situation which was so bad that he would automatically find future

90

danger (RR 49 at 178). He did state that he thought the death penalty was used too seldom (RR 49 at 181, 182). He also stated the death penalty should be used for other crimes than murder; such as for rape (RR 49 at 187, 188). But he stated that the two special issues are important (RR 49 at 189). He would keep an open mind on punishment until he got through the whole process (RR 49 at 190). After finding a defendant guilty of capital murder and finding him to be a future danger, he could still find mitigating circumstances (RR 49 at 191, 192).

In his challenge for cause, the Appellant made multiple general claims that Mr. Martinez was biased, but nothing in the record supported these claims (RR 49 at 201-208). In denying the Appellant's challenge for cause, the Judge stated: "I observed his demeanor. I heard his answers. I thought he probably was as much down the middle of the line that the defense has been looking for as anybody we've had." (RR 49 at 209). It is understandable that appellate counsel made no separate claim that this juror should have been struck for cause. There was no basis for striking this juror for cause.

To show error, the Appellant must show that he was deprived of a peremptory challenge because the judge improperly overruled a proper challenge for cause and thereby forced him to use a peremptory strike. There was no basis to the Appellant's claim that he was entitled to additional strikes because the trial judge properly overruled his challenge for cause for Michael Martinez; as well as

91

for venirepersons Brenda Woods, Stephanie Cooper, Brenda Lee, and Donna Vanscoy (discussed in prior points of error). The trial court properly overruled the Appellant's motion for additional peremptory challenges.

**STATE'S REPLY TO APPELLANT'S EIGHTH POINT OF ERROR**

The Appellant claims the trial court erred in not allowing him to ask a repetitive vague question to venireperson Donna Vanscoy. The Judge properly sustained the State's objection and at worst, any error would have been harmless.

## DISCUSSION

The trial court properly sustained the Appellant's question to venireperson Donna Vanscoy as repetitious.

*Relevant Facts*

The Appellant claims the trial court erred in not allowing him to ask Donna Vanscoy, the following question during her voir dire examination:

> Now when we talk about this mitigation, where would you -- as far as the way this goes, where would you -- I know it says taking into consideration all the evidence, including the circumstances of the offense, Defendant's character and background, personal moral culpability of the Defendant, where would you expect the mitigation to come from? (RR 32 at 101).

The State objected to the question and after both sides argued the issue at a bench conference, the trial court sustained the State's objection (RR 32 at 101-102).

Immediately prior to this, the Appellant asked and received the following answer on this identical issue:

> **Mr. Wooten:** Okay. But when it gets to Special Issue No. 2, there is no burden, which is odd. And I guess what I want to make sure is

would you require the Defendant or the defense to bring you mitigation to answer this issue?

**Donna Vanscoy:** No. (RR 32 at 100).

In addition, during the State's voir dire examination, the following question

and answer took place:

**Ms. Aldous:** And remember, the Defendant never has to bring you any evidence, including mitigation.

**Donna Vanscoy:** Yes.

**Ms. Aldous:** Okay? So you cannot require the Defendant to ever bring you anything.

**Donna Vanscoy:** Okay.

**Ms. Aldous:** Can you follow that?

**Donna Vanscoy:** Yes. (RR 32 at 66).

….

**Ms. Aldous:** And you realize nobody has a burden on Special Issue No. 2?

**Donna Vanscoy:** That's right.

**Ms. Aldous:** The Defendant never has to bring you any evidence.

**Donna Vanscoy:** That's right (RR 32 at 71, 72).

*Repetition*

The trial court properly limited the Appellant's questions as repetitious. Prior to the complained of question, this venireperson was asked essentially the same question three times.

A trial court may impose reasonable restrictions on the exercise of *voir dire* examination. ***McManus v. State***, 591 S.W.2d 505, 520 (Tex. Crim. App. 1979), *overruled on other ground*s, 744 S.W.2d 112 (Tex. Crim. App. 1988); ***McCarter v. State***, 837 S.W.2d 117, 119, 120 (Tex. Crim. App. 1992). Duplicitous questions may, within the court's discretion, be limited. ***McManus*** at 520; ***Guerra v. State***, 771 S.W.2d 453, 467-68 (Tex. Crim. App. 1988), *cert. denied*, 109 S.Ct. 3260 (1989). Moreover, if the prospective juror states his or her position clearly, unequivocally, and without reservation, the trial court does not err in refusing to permit further questioning. ***Guerra*** at 467-68.

In *McManus*, a capital murder case, the Judge questioned jurors regarding the extent of their exposure to pre-trial publicity and whether they formed any opinion or conclusion from any publicity. The judge only allowed defense questioning regarding pre-trial publicity if a juror indicated he had formed an opinion or conclusion from the publicity. The Court of Criminal Appeals found the trial court did not abuse its discretion in prohibiting the defense from again questioning the venireman about pre-trial publicity. ***Id.*** at 518-520.

In ***McCray v. State***, A14-89-00271-CR, 1991 WL 235281(Tex. App. –

Houston [14th Dist.] Nov. 14, 1991, *pet. ref'd*)(not designated for publication), *cert.*

*denied*, 113 S.Ct. 623 (1992), the venireman informed the court on three occasions

that she would follow the trial court's instructions as to State law. The Appellant

was not allowed to ask further questions on this issue. The Court of Appeals held

the trial court did not abuse its discretion in not allowing the Appellant to ask

further questions on this issue. ***Id.*** at *5, 6. In the instant case, the venireman had

already been asked essentially the same question three times. The trial court did

not abuse its discretion in limiting the Appellant's questioning.

*Commitment Question*

In addition, the judge may have viewed the question as an improper

commitment question. This vague question, "where would you expect the

mitigation to come from" could be easily interpreted by the venireperson as asking

what evidence she would expect to be presented to show mitigation. As such, it

would be an improper commitment question. *See **Boyd v. State***, 811 S.W.2d 105,

119 (Tex. Crim. App. 1991), *cert. denied*, 112 S.Ct. 448 (1991(improper to ask

jurors what type of case the death penalty should be imposed). Defense counsel has

an obligation to ask questions calculated to bring out that information which might

indicate a juror's inability to be impartial. He must ask specific questions and not

rely on broad ones. ***Barajas v. State,*** 93 S.W.3d 36, 41 (Tex. Crim. App. 2002).

This type of vague question was impermissible because it amounted to a "global fishing expedition." *See Id.* at 37-41.

The law does not require that a juror consider any particular piece of evidence as mitigating. *Davis v. State*, 313 S.W.3d 317, 346 (Tex. Crim. App. 2010), *cert. denied*, 132 S.Ct. 122 (2011). A juror is not required to "give a particular variety of 'mitigating evidence' any consideration." *Id*. The law requires only that defendants be allowed to present relevant, mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating. *Id.* Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry. *Id.* The trial court did not abuse its discretion in disallowing this vague question because of its potential as an improper commitment question.

### Harm

Even had there been error, it would have been harmless. A judge's error in prohibiting defense counsel from asking proper questions of the venire is analyzed under the standard for non-constitutional harm under Rule 44.2(b) of the Rules of Appellate procedure. *Easley v. State*, 424 S.W.3d 535, 541 (Tex. Crim. App. 2014). Under this standard "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* at 541, 542; **TEX. R. APP. P. 44.2(b) (Vernon 2003)**. In reviewing harm, the appellate court should

consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory, and any defensive theories, closing arguments, *voir dire*, and whether the State emphasized the error. ***Easley*** at 542.

In the instant case, this juror on three prior occasions answered that she would not require the defense to produce any evidence of mitigation; twice in response to State questioning and once under defense questioning. She also was informed by the State that there was no burden of proof on the issue of mitigation (RR 32 at 66). She thought it was good that mitigation could be based just on mercy (RR 32 at 69, 70-72). In response to defense questioning, she answered that she could base mitigation on mercy alone (RR 32 at 97, 98).

The record is clear that the complained-of question would have yielded the same result as the previously asked questions involving this same issue. Moreover, the juror's opinion in regard to any failure of the defense to present mitigating evidence was inconsequential because the Appellant produced a significant amount of mitigation evidence at punishment. It paled in comparison to the evidence for the death penalty, but this is not a case where trial counsel presented no mitigation evidence. Rather than repeat that evidence here, the State would refer the Court to

98

the Statement of Facts in this brief. The Appellant can show no harm in the judge disallowing this vague redundant question.

In *Easley*, the trial court committed error by refusing to allow defense counsel to compare and contrast the different standards of proof by comparing the different civil standards with the standard of beyond a reasonable doubt. The Court of Criminal Appeals found the error to be harmless, in part, because the defendant had otherwise been allowed to question the jury regarding reasonable doubt. *Id.* at 542. In the instant case, the trial court did not abuse its discretion in disallowing this question, and even if there had been error, it would have been harmless.

## STATE'S REPLY TO APPELLANT'S NINTH POINT OF ERROR

The Appellant claims the trial court erred in disallowing his question to venireperson Stephanie Cooper as to her feelings regarding the death penalty being the only appropriate remedy under a detailed set of facts. The Judge properly sustained the State's objection to this improper commitment question and at worst, any error would have been harmless.

## DISCUSSION

The trial judge properly disallowed a defense question to venireperson Stephanie Cooper. The Appellant first asked the venireperson to assume that a defendant intentionally killed an innocent police officer[1]; that there was no self-defense or mistake; that the victim did not provoke the defendant; that the killing was senseless and cold blooded; and that the defendant was not insane, mentally retarded, or intoxicated (RR 27 at 190-192). He then asked, "What are your feelings in that hypothetical about the death penalty being the only appropriate remedy for that guilty murderer?" The State objected to this question and the Judge sustained the objection (RR 27 at 192-195).

*Analysis*

This question was a poorly veiled attempt to ask an improper commitment question. A commitment question is improper unless it includes only those facts

---

[1] It should be noted that Ms. Cooper's husband was a police officer (RR 27 at 131)

necessary to lead to a valid challenge for cause. *Standefer v. State,* 59 S.W.3d 177, 182, 183 (Tex. Crim. App. 2001). A commitment question is one that commits a prospective juror to resolve or to refrain from resolving, an issue a certain way after learning a particular set of facts. *Id.* at 179. An improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence, whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice. *Sanchez v. State,* 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). Even an otherwise proper question is impermissible, if it attempts to commit the juror to a particular verdict based on particular facts. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

The real question Appellant was asking was "do you think the death penalty is the only appropriate punishment given the stated set of facts." The Appellant merely added the words "what are your feelings" in an attempt to avoid a *Standefer* objection. In *Barajas v. State*, the Court of Criminal Appeals dealt with a similar issue. In *Barajas*, the Appellant sought to escape the limits of the commitment-question rule by asking, "*Can you be fair and impartial* in a case in which the victim is nine years old." *Id.* at 37, 38. The court noted that if this type of question were permitted, then any commitment question could be made proper by beginning the question with the words, "can you be fair." *Id.* at 41. The court found this type of vague question was impermissible because it amounted to a "global fishing

101

expedition" *Id.* at 39; *See also* **Smith v. State**, 703 S.W.2d 641, 645 (Tex. Crim. App. 1985), *overruled on other grounds*, 424 S.W.3d 535 (2014) (question asking for venireman's *thoughts* on the insanity defense were improper); **Boyd v. State**, 811 S.W.2d 105, 119 (Tex. Crim. App. 1991), *cert. denied*, 112 S.Ct. 448 (1991)(improper to ask jurors what type of case the death penalty should be imposed); **Sells v. State**, 121 S.W.3d 748 (Tex. Crim. App. 2003), *cert. denied*, 124 S.Ct. 511 (2003)(improper to ask a venireperson if he could imagine facts in the capital murder of a young girl that would permit him to answer "no" to the future danger special issue). Defense counsel has an obligation to ask questions calculated to bring out that information which might indicate a juror's inability to be impartial. He must ask specific questions and not rely on broad ones. **Barajas** at 41. In the instant case, the Appellant's question constituted a global fishing expedition and was improper.

### *Harm*

Even had there been error, it would have been harmless. A judge's error in prohibiting defense counsel from asking proper questions of the venire is analyzed under the standard for non-constitutional harm under Rule 44.2(b) of the Rules of Appellate procedure. **Easley v. State**, 424 S.W.3d 535, 541 (Tex. Crim. App. 2014). Under this standard "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* at 541, 542; **TEX. R.**

**APP. P. 44.2(b) (Vernon 2003)**. In reviewing harm, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory, and any defensive theories, closing arguments, *voir dire*, and whether the State emphasized the error. *Easley* at 542.

There is no harm in this question being disallowed, because other proper questions asked by the parties covered the same material as the improper question asked by the Appellant. The improper question was apparently asked to determine if this venire person could be fair during the punishment phase of trial. Ms. Cooper's answers to other questioning by both parties showed that she would be a fair juror in assessing punishment. During *voir dire*, she stated that she would consider the full range of punishment and not find for death automatically (RR 27 at 127, 138, 140). She could keep an open mind on punishment after finding the Appellant guilty (RR 27 at 139, 158, 159). She felt both potential punishments were appropriate if the Appellant were found guilty (RR 27 at 140, 141). She would hold the State to their burden to show future danger and would listen to all the evidence in making this determination (RR 27 at 143, 141-143, 159). She would not automatically find for future danger after determining the Appellant

guilty of capital murder (RR 27 at 148). She would keep an open mind (RR 27 at 158, 159). She would consider all the evidence of mitigation before assessing punishment (RR 27 at 156-158). She would further keep an open mind as to punishment after finding him both guilty of capital murder and finding him a future danger (RR 27 at 159, 166). She considered both penalties to be appropriate in a capital case (RR 27 at 160). She could sentence the Appellant to life even where there were no extenuating circumstances (RR 27 at 163). She stated that she could be fair (RR 27 at 167). She said that if her relative were charged for this offense, she would be a "safe" juror (RR 27 at 200, 201). The lack of being asked this one question did not impede the Appellant's ability to determine whether to use his strike against this venireman. And in fact, he did use a peremptory strike against this venireperson (RR 27 at 213).

In *Easley*, the trial court committed error by refusing to allow defense counsel to compare and contrast the different standards of proof by comparing the different civil standards with the standard of beyond a reasonable doubt. The Court of Criminal Appeals found the error to be harmless, in part, because the defendant had otherwise been allowed to question the jury regarding reasonable doubt. *Id.* at 542. In the instant case, the trial court did not abuse its discretion in disallowing this question, and even if there had been error, it would have been harmless.

**STATE'S REPLY TO APPELLANT'S TENTH POINT OF ERROR**

The Appellant claims the trial court erred in disallowing his question to venireperson Audrey Holt as to whether she thought most of the community favored the death penalty. The Judge properly sustained the State's objection to this irrelevant question. At worst any error would have been harmless.

**DISCUSSION**

The trial court did not error in disallowing a defense question to Audry Holt which was irrelevant to the jury selection process. During voir dire, the Appellant asked this venireman the following question:

> **Q.** Okay. Do you have a feel for what the community thinks about the death penalty? Do you think most of the community is in favor of it?

The State objected to the question and the Judge sustained the objection (RR 23 at 99-100). This question failed to seek the venireperson's views as to an issue applicable to the case. It did not ask the juror her personal views regarding the death penalty, but instead asked her information regarding the community's views of the death penalty.

*Analysis*

A trial court commits *no* error if it precludes improper *voir dire* questioning. A "proper" question is one which seeks to discover a veniremember's views on an *issue applicable to the case. **Rhoades v. State**,* 934 S.W.2d 113, 118 (Tex. Crim. App. 1996) (emphasis by court). An appellate court must analyze a trial court's

limitation on questioning under an abuse of discretion standard, with the focus on whether the defendant proffered a proper question. *Id.* at 119.

A juror's belief as to whether the community is in favor of the death penalty was irrelevant to any issue in the Appellant's trial. *See Baker v. State*, 87 Tex. Crim. 305, 307, 308, 221 S.W.607, 608, 609 (Tex. Crim. App. 1920) (evidence as to whether there was a feeling in the community against disloyal Germans was irrelevant to sentencing and any claim of self-defense); *Cortez v. State*, 683 S.W.2d 419, 420-421 (Tex. Crim. App. 1984) (State's argument, *that the people of the county would only be satisfied with life imprisonment*, was reversible error, because it urged the jury to determine punishment based on improper criteria).

While there is no case law dealing with the specific question asked in the instant case, there are several cases dealing with similar questions. In *Rhodes*, the Court of Criminal Appeals held that disallowing the defense discussion during voir dire of parole eligibility in a capital murder trial was proper because parole was not a matter for the jury's consideration. *Rhoades*, 934 S.W.2d at 118.

In *Adams v. State*, 577 S.W.2d 717 (Tex. Crim. App. 1979)*, reversed on other grounds*, 100 S.Ct. 2521(1980), the Court of Criminal Appeals found that asking two venireman whether they wanted to hear from the defendant and asking a second venireman if she was prejudiced against people with different lifestyles,

were both improper questions because they were not relevant to an issue in the case. *Id.* at 724, 725.

In *Smiley v. State*, 129 S.W.3d 690, 696 (Tex. App. – Houston [1ˢᵗ Dist.] 2004, *no pet.*), the Court of Appeals held that the trial court properly disallowed the defense question asking if the venireman could consider probation in a sexual assault case where the defendant was not eligible for probation. *Id.*; *See also Penry v. State*, 903 S.W.2d 715, 739 (Tex. Crim. App. 1995), *cert. denied*, 116 S.Ct. 480 (1995)(Asking venireman if persons who are mentally retarded should be allowed to serve on a jury was an improper question). In the instant case, the trial court did not abuse its discretion in disallowing this question as to whether she thought most of the community favored the death penalty.

*Harm*

Even if the Court were to find the Appellant's question to be proper, the trial court's disallowance of the question was not harmful. A judge's error in prohibiting defense counsel from asking proper questions of the venire is analyzed under the standard for non-constitutional harm under Rule 44.2(b) of the Rules of Appellate procedure. *Easley v. State*, 424 S.W.3d 535, 541 (Tex. Crim. App. 2014). Under this standard "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* at 541, 542; **TEX. R. APP. P. 44.2(b) (Vernon 2003)**. In reviewing harm, the appellate court should consider everything

in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory, and any defensive theories, closing arguments, *voir dire*, and whether the State emphasized the error. ***Easley*** at 542.

Here, venireperson Holt stated that she would keep an open mind as to whether life imprisonment was appropriate based on the evidence presented (RR 23 at 65-69). There was no evidence presented at trial regarding any community expectation of punishment nor was there argument by either party on this subject. The Appellant cites to no evidence or argument otherwise. Nor was there any further discussion during the voir dire of this venireperson of any community expectations. The trial court did not abuse its discretion in disallowing this question, and even if there had been error, it would have been harmless.

## CONCLUSION

WHEREFORE, the State of Texas prays that judgment of conviction and sentence of death against Appellant be upheld by the Texas Court of Criminal Appeals.

Respectfully submitted,


/S/  JERI YENEE
**JERI YENNE**
CRIMINAL DISTRICT ATTORNEY
BRAZORIA COUNTY, TEXAS
SBN 04240950

/S/  DAVID BOSSERMAN
**DAVID BOSSERMAN**
Assistant Criminal District Attorney
SBN 02679520
111 East Locust, Suite 408A
Angleton, Texas  77515
(979) 864-1230
(979) 864-1525 (Fax)

**ATTORNEYS FOR THE STATE OF TEXAS**

**CERTIFICATE OF COMPLIANCE**

I hereby certify that Appellant Brief for the State, as calculated under Appellate Rule 9.4(i), contains 26,204 words as determined by the Word program used to prepare this document.

/S/  DAVID BOSSERMAN
**DAVID BOSSERMAN**

**CERTIFICATE OF SERVICE**

The undersigned Attorney for the State of Texas certifies that a true copy of this State's Brief was served by E-service in compliance with Article 9.5 of the Rules of Appellate procedure on Jimmy Phillips Jr., attorney for the Appellant, who offices at 515 N. Velasco St., Angleton, Texas, this 3rd day of August, 2015.

/S/  DAVID BOSSERMAN
**DAVID BOSSERMAN**